THE EDUCATION INITIATIVE PAC, A NEVADA POLITICAL ACTION COMMITTEE, APPELLANT, *v.* COMMITTEE TO PROTECT NEVADA JOBS, A NEVADA NONPROFIT COMPANY; AND ROSS MILLER, IN HIS OFFICIAL CAPACITY AS THE NEVADA SECRETARY OF STATE, RESPONDENTS.

No. 61996

January 31, 2013                                    293 P.3d 874

*Dyer, Lawrence, Flaherty, Donaldson & Prunty* and *Michael W. Dyer, Francis C. Flaherty*, and *Sue S. Matuska*, Carson City, for Appellant.

*Brownstein Hyatt Farber Schreck, LLP*, and *Joshua J. Hicks*, Las Vegas; *Brownstein Hyatt Farber Schreck, LLP*, and *Sean D. Lytlle* and *Clark V. Vellis*, Reno, for Respondent Committee to Protect Nevada Jobs.

*Catherine Cortez Masto*, Attorney General, and *K. Kevin Benson*, Deputy Attorney General, Carson City, for Respondent Secretary of State.

Before the Court EN BANC.

## OPINION

By the Court, HARDESTY, J.:

In this appeal, we consider the proper standard of review to be applied when reviewing the adequacy of a ballot initiative's description of effect. Nevada's Constitution permits the Legislature to provide procedures to facilitate the initiative process. In 2005, the Legislature enacted NRS 295.009(1)(b), which requires a ballot initiative to provide in 200 words or less a description of the effect of the initiative. A description of effect serves a limited purpose to facilitate the initiative process, and to that end, it must be a straightforward, succinct, and nonargumentative summary of what the initiative is designed to achieve and how it intends to reach those goals. Given that limited purpose and the 200-word re-

striction, the description of effect cannot constitutionally be required to delineate every effect that an initiative will have; to conclude otherwise could obstruct, rather than facilitate, the people's right to the initiative process. In reviewing an initiative's description of effect, a district court should assess whether the description contains a straightforward, succinct, and nonargumentative statement of what the initiative will accomplish and how it will achieve those goals. Because we conclude that the description of effect at issue in this case satisfies this requirement, and because the single-subject challenge to the initiative lacks merit, we affirm in part and reverse in part the district court's order invalidating the initiative here.

## BACKGROUND

Appellant, The Education Initiative PAC (EI PAC), a Nevada political action committee, seeks to enact a law through Nevada's ballot initiative process to provide a new funding source for the state's public school K-12 education needs. This proposed law, which EI PAC entitled ''The Education Initiative,'' would impose a two-percent margin tax on all Nevada businesses with annual revenue of more than $1 million.[1] After filing the proposed ballot initiative with the Secretary of State, EI PAC began circulating petitions to gather the necessary signatures so that the Initiative could be presented to the Legislature in 2013 and, if necessary, be placed on the 2014 general election ballot.

Respondent Committee to Protect Nevada Jobs filed a complaint for declaratory and injunctive relief in the First Judicial District Court challenging the Initiative. In its complaint, the Committee sought a declaration that (1) EI PAC's Initiative violated NRS 295.009's single-subject rule because it sought to enact a multi-subject law, and (2) its description of effect was misleading in several respects. The Committee asked the district court to enjoin the Secretary of State from presenting the Initiative to the Legislature in 2013 and from eventually placing the Initiative on the 2014 general election ballot.

Although the district court rejected the Committee's single-subject rule challenge, it found that the Initiative's description of effect was ''incomplete, deceptive, [and] misleading.'' As a result, the district court granted the Committee's requested relief in part, enjoining the Secretary of State from presenting the Initiative to the Legislature, but rejecting the Committee's request that EI PAC be

---

[1] A complete copy of the Initiative is attached to this opinion as an addendum.

enjoined from continuing to gather petition signatures.[2] This appeal followed.

## DISCUSSION

If enacted, the Education Initiative would require, among other things, that the margin tax revenues raised under the new law be deposited into the state Distributive School Account, which, in essence, is a subaccount of the State General Fund, NRS 387.030(1), and then be "apportioned among the several school districts . . . at the times and in the manner provided by [existing] law for the money in the State Distributive School Account." To understand the arguments raised by the parties to this appeal and this court's legal conclusions, we begin by examining the initiative process before addressing the parties' contentions.

### Nevada's ballot initiative process

Since 1912, Nevada's Constitution has secured to the citizens of this state "the power to propose, by initiative petition, statutes and amendments to statutes . . . and to enact or reject them at the polls." Nev. Const. art. 19, § 2(1). The constitution requires the ballot initiative proponent to file a copy of the initiative with the Secretary of State and then gather a required number of signatures from registered voters who likewise support the initiative's ideas. Nev. Const. art. 19, § 2(2), (3). Once the required number of signatures are gathered, the proponent must then submit the signatures to the Secretary of State for verification. Nev. Const. art. 19, § 2(3). If the Secretary verifies that the required number of signatures has been gathered, the Secretary must transmit the initiative to the Legislature "as soon as the Legislature convenes and organizes" for its next legislative session. *Id.* At that point, if the Legislature chooses to enact the initiative and the governor ap-

---

[2]While this appeal was pending, EI PAC continued to obtain and ultimately submitted more than the required number of voter signatures. The Secretary of State subsequently completed the process of verifying those signatures. Nev. Const. art. 19, § 2(3).

Because this appeal required resolution before the 2013 Legislature convened, and since the issues involved are purely legal, both EI PAC and the Committee agreed to not file appellate briefs. Thus, all of the arguments that the parties made in the district court—including those made by the Committee and rejected by the district court—are de facto before this court. *Cf. Ford v. Showboat Operating Co.*, 110 Nev. 752, 755, 877 P.2d 546, 548 (1994) (recognizing that a party "who is not aggrieved by a judgment need not appeal from the judgment in order to raise arguments in support of the judgment not necessarily accepted by the district court"). Additionally, respondent Secretary of State Ross Miller indicated, in the initial stages of this matter, that he took no position on the merits of the initiative petition at issue in this appeal.

proves it, the initiative becomes law. *Id.* If, however, the Legislature rejects the initiative or simply fails to take action on it during the first 40 days of the session, the Secretary must then place the initiative on the next general election ballot, *id.*, which in this case would be in 2014.

The constitution authorizes the Legislature to ''provide by law for procedures to facilitate'' the people's power to legislate by initiative. Nev. Const. art. 19, § 5. Before an initiative can be placed on the ballot, NRS 293.250(5) requires the Secretary of State to prepare an explanation of what the initiative entails, which ''must be in easily understood language and of reasonable length.'' In addition, the Secretary must appoint two committees, one of which writes arguments advocating passage of the initiative, while the other drafts arguments in opposition to its passage.[3] NRS 293.252(1), (5)(d). Each committee also writes rebuttals to the other committee's argument. NRS 293.252(5)(e). Among other things, each committee's argument and rebuttal ''[s]hall address . . . [t]he fiscal impact of the initiative.'' NRS 293.252(5)(f)(1). Once the Secretary approves each committee's argument and rebuttal, they are placed on the sample ballot distributed to the voters before the general election along with the Secretary's explanation of the initiative. NRS 293.097; NRS 293.252(8). Thus, before casting their votes, voters are presented not only with the Secretary's neutral explanation of the initiative, but also with arguments for and against the initiative's enactment prepared by people with an interest in seeing the initiative pass or fail.

In 2005, the Legislature enacted NRS 295.009, the statute at issue in this appeal, which made two key modifications to the initiative process. Specifically, NRS 295.009 sets forth two requirements that the proponent of a ballot initiative must satisfy: (1) the proposed law must embrace only ''one subject,'' NRS 295.009(1)(a); and (2) when gathering petition signatures, the proponent's petition must include, ''in not more than 200 words, a description of the effect of the initiative or referendum if the initiative or referendum is approved by the voters.''[4] NRS 295.009(1)(b). ''The description must appear on each signature page of the petition.'' *Id.*

To resolve this appeal, we begin by examining the function of a description of effect in the initiative process and how a court

---

[3]Each committee consists of three people, all of whom are appointed by the Secretary. NRS 293.252(1). In making the appointments, the Secretary ''shall consider'' appointing ''[a]ny person who has expressed an interest in serving on the committee.'' NRS 293.252(4)(a).

[4]By its terms, NRS 295.009 applies to both initiatives and referendums. Accordingly, the analysis in this opinion is equally applicable in the referendum context.

should analyze a description of effect in reviewing a challenge to the sufficiency of this description. We then consider whether the initiative violates the single-subject rule.

*The Initiative's description of effect adequately summarizes the Initiative*

In determining whether a ballot initiative proponent has complied with NRS 295.009, "it is not the function of this court to judge the wisdom" of the proposed initiative. *Nevada Judges Ass'n v. Lau*, 112 Nev. 51, 57, 910 P.2d 898, 902 (1996). When a district court's decision to grant declaratory and injunctive relief depends on a pure question of law, our review is de novo. *Nevadans for Nevada v. Beers*, 122 Nev. 930, 942, 142 P.3d 339, 347 (2006).

Pursuant to NRS 295.009(1)(b), EI PAC included with its petition the following description of effect of its Initiative:

> This statutory initiative proposes to impose a 2-percent margin tax on business entities doing business in Nevada. Exemptions include: natural persons not engaged in business; entities with total revenue of $1,000,000 or less; passive entities; Section 501(c) organizations. Margin is the lesser of: (1) 70 percent of entity's total revenue from its entire business; or (2) entity's total revenue from its entire business, minus (at its election) the cost of goods it has sold or amount of compensation it has paid to owners and employees. An entity's taxable margin, against which the tax is imposed, is that part of its margin apportioned to Nevada. Revenues from the tax would be deposited in the State Distributive School Account in the State General Fund, and used for the support of K-12 education. The 2-percent modified business tax now paid by financial institutions would temporarily be increased to 2.29 percent, and potentially to 2.42 percent, to provide money for the Department of Taxation to begin to administer the margin tax. Liability for the margin tax would begin to accrue on January 1, 2014, if the initiative is approved by the Legislature, or January 1, 2015, if approved by voters.

Relevant to this appeal, EI PAC's description of effect states that the Initiative seeks to impose a new margin tax, describes certain exemptions from the tax, and briefly summarizes how the tax will be calculated. It then provides that the margin tax revenues "would be deposited in the State Distributive School Account in the State General Fund, and used for the support of K-12 education" and notes that the two-percent modified business tax will be temporarily increased to cover initial administrative costs for the margin tax.

This court has previously declared that a description of effect must be " 'straightforward, succinct, and nonargumentative,' " *Las Vegas Taxpayer Comm. v. City Council*, 125 Nev. 165, 183, 208 P.3d 429, 441 (2009) (quoting *Herbst Gaming, Inc. v. Sec'y of State*, 122 Nev. 877, 889, 141 P.3d 1224, 1232 (2006)), and it must not be deceptive or misleading.[5] *See Stumpf v. Lau*, 108 Nev. 826, 833, 839 P.2d 120, 124 (1992), *overruled on other grounds by Herbst Gaming*, 122 Nev. at 888, 141 P.3d at 1231. However, the description of effect does not need to explain "hypothetical" effects of an initiative. *See Herbst Gaming*, 122 Nev. at 889, 141 P.3d at 1232. The opponent of a ballot initiative bears the burden of showing that the initiative's description of effect fails to satisfy this standard. *See Las Vegas Taxpayer Comm.*, 125 Nev. at 176, 208 P.3d at 436 (explaining that the party seeking to invalidate the initiative bears the burden of establishing that the initiative is "clearly invalid").

In challenging the Initiative in district court, the Committee argued that EI PAC's description of effect was inadequate, both because it failed to include certain information and because the information it did include was misleading. In responding to the Committee's contentions, EI PAC argued that, in light of the 200-word limitation imposed on descriptions of effect, it would be impossible to include all of the information that the Committee believed was necessary for inclusion. Moreover, EI PAC maintained that the perceived inaccuracies in its description stemmed from an overly technical reading of the information contained therein. The district court agreed with certain assertions made by the Committee and concluded that the description was "incomplete, deceptive, [and] misleading" and invalidated the Initiative on that basis.

As explained below, both the Committee and the district court have misapprehended the function of an initiative's description of effect, which we conclude does not need to mention every possible effect of an initiative. Instead, a description of effect must identify what the law proposes and how it intends to achieve that proposal, all within a 200-word limit. Given this constraint and in light of its statutory function to facilitate the initiative process, a

---

[5]In *Las Vegas Taxpayer Committee*, 125 Nev. at 181-82, 208 P.3d at 440, we invalidated a ballot initiative because it violated the single-subject rule. In addition, we considered the initiative's description of effect and agreed with the district court's conclusion that the description was "materially misleading." *Id.* at 182-83, 208 P.3d at 440-41. The "materially misleading" standard alluded to in *Las Vegas Taxpayer Committee* is thus attributable to the district court and is not intended to be part of this court's standard for reviewing descriptions of effect.

hyper-technical interpretation of the requirements for a description of effect may impede the people from exercising their constitutional right to propose laws and is therefore an inappropriate method for assessing the adequacy of a description of effect.

### *A description of effect serves to broadly inform a petition signer about the initiative*

With regard to the function of an initiative's description of effect, in this case, the district court and the parties mistakenly reviewed the description of effect with an eye on hypothetical effects or consequences of the Initiative, without regard for the role that the description of effect serves in the initiative process. This court has recognized that an initiative's description of effect is intended to " 'prevent voter confusion and promote informed decisions.' " *Nevadans for Nevada v. Beers*, 122 Nev. 930, 939-40, 142 P.3d 339, 345 (2006) (quoting *Campbell v. Buckley*, 203 F.3d 738, 745-46 (10th Cir. 2000)). Consequently, before circulating an initiative for signatures, the proponents must file it with the Secretary of State. NRS 295.015(1). The Secretary does not evaluate or otherwise assess the description of effect before the proponents begin gathering signatures. *Id.* Instead, the initiative and the description of effect are made available to the public in their entirety, on the Secretary's website. NRS 295.015(4). During the signature-gathering process, signers, before signing the petition, may read the initiative on the Secretary's website or the copy in the circulator's possession, and/or signers may read the 200-word description of effect, which must be located on each signature page of the petition. NRS 295.009(1)(b); *see also Herbst Gaming*, 122 Nev. at 888-89, 141 P.3d at 1232 (providing that if a petition signer questioned the meaning of a phrase used in the initiative's title, that question could be resolved by reviewing the actual text of the initiative). Under these circumstances, the legislative purpose of requiring that a description of effect accompany the petitions circulated for signature gathering is achieved by providing a summary that captures what an initiative is designed to achieve and how it intends to reach those goals, albeit within the boundaries of 200 words.

The utility of the description of effect is confined to the preliminary phase of the initiative process, when the proponent seeks to garner enough initial support so that the initiative will be considered by the Legislature and the voters. Our understanding of the function of a description of effect to facilitate the initiative process is informed by the Legislature's deliberations when it considered whether to adopt NRS 295.009(1)(b) and by the Legislature's decision to limit proponents to describing a proposed initiative in 200 words or less.

### Legislative deliberations

During the legislative process for enacting NRS 295.009(1)(b), legislators raised concerns over who would write the description of effect, who would determine its accuracy, and whether it would even be possible to verify the accuracy of a position or opinion presented in the description of effect. Hearing on A.B. 185 and S.B. 224 Before the Senate Legislative Operations and Elections Comm., 73d Leg. (Nev., May 12, 2005). With this in mind, in an initial draft of the bill that would ultimately become NRS 295.009(1)(b), the Legislature considered requiring an initiative petition to contain an *"accurate* description of the effect of the initiative."[6] A.B. 185, 73d Leg. § 1 (first reprint) (emphasis added) (as discussed by the Senate Legislative Operations and Elections Committee in conjunction with S.B. 224, May 12, 2005). The reasoning behind this initial approach was that the Legislature was concerned with the prospect of people signing initiative petitions without understanding what the initiative really entailed. *See* Hearing on A.B. 185 Before the Senate Legislative Operations and Elections Comm., 73d Leg. (Nev., May 10, 2005).

As the Legislature assessed how best to address this concern, testimony addressing the proposed legislation highlighted a significant problem with the approach taken in the initial draft of this bill, in that the Legislature could not constitutionally require an accurate forecast of all of an initiative's potential effects in 200 words or less. *See* Hearing on A.B. 185 Before the Senate Legislative Operations and Elections Comm., 73d Leg. (Nev., May 10, 2005) (statement of John L. Wagner, Burke Consortium of Carson City) (expressing skepticism as to whether a ballot initiative proponent could write an adequate summary in 200 words or less); Hearing on A.B. 185 Before the Assembly Elections, Procedures, Ethics, and Constitutional Amendments Comm., 73d Leg. (Nev., March 29, 2005) (statement of Janine Hansen, President, Nevada Eagle Forum) (discussing the constitution and explaining that "the Legislature should not be making it any more difficult to petition, but [that it should] facilitate that process"). In the end, the Legislature came to a compromise in which it agreed that the initiative's proponent would write the description of effect, it deleted the word "accurate" from the description-of-effect requirement, and it determined that the only means of assessing a description of effect's adequacy would be for someone to challenge it in court. NRS 295.009(1)(b); NRS 295.061(1).

---

[6]Although NRS 295.009 was enacted into law by Senate Bill 224, most of the Legislature's attention to the description-of-effect requirement comes from discussions of Assembly Bill 185. Shortly before Senate Bill 224's enactment, the Legislature inserted the desirable portions of Assembly Bill 185 into Senate Bill 224.

The Legislature, like in other states, could have prohibited a ballot initiative proponent from gathering petition signatures until the proponent receives a pre-approved summary from the state official in charge of elections. *See, e.g.*, Alaska Stat. § 15.45.090 (2012) (requiring the lieutenant governor to prepare an "impartial summary"); Cal. Elec. Code §§ 9004, 9008, 9014 (West 2013 Supp.) (requiring the attorney general to prepare a "circulating title" and "summary"); Colo. Rev. Stat. §§ 1-40-105, 1-40-106 (2012) (requiring the secretary of state to convene a "title board," which prepares a "title" and "submission clause"); Or. Rev. Stat. §§ 250.065, 250.067 (2011) (requiring the attorney general to prepare a "ballot title"); Wash. Rev. Code Ann. §§ 29A.72.060-.090 (West 2005) (requiring the attorney general to prepare a "ballot title" and "summary"). But the Legislature chose instead to allow an initiative's proponent to write the required description and to gather signatures before its adequacy has been determined. This approach makes sense because, under Nevada's Constitution, if an initiative is not adopted by the Legislature and thus moves on for presentation to the voters, the voters have the Secretary of State's official explanation and the required arguments for and against its enactment to review in determining whether to vote in favor of or against the initiative. Thus, once proponents have gathered the necessary signatures to file the initiative with the Secretary of State for verification, the description of effect plays no further role in the remaining initiative process, except perhaps, to assist the committees mandated with preparing the pros and cons for the ballot under the Secretary of State's supervision.

### 200-word limit

The Legislature also chose to restrict the description of effect to a mere 200 words. As EI PAC points out, attempting to comply with the district court's findings regarding what must be included in the description of effect is difficult at best given the 200-word limit. Because a proponent can only explain so much in 200 words, EI PAC maintains that its description should be deemed adequate because it made a legitimate effort to summarize what it believes to be the Initiative's main components. EI PAC's argument to that effect is persuasive.

Given the 200-word limit imposed on these descriptions, they cannot constitutionally be required to explain every detail or effect that an initiative may have. This is especially true where, as here, the actual text of the Initiative is 25 pages in length. To reach a different conclusion would significantly hinder the people's power to legislate by initiative and effectively bar all but the simplest of ballot measures. Indeed, such a restriction would far exceed the Nevada Constitution's grant of authority to the Legislature to "pro-

vide by law for procedures *to facilitate''* the people's exercise of the initiative process. Nev. Const. art. 19, § 5 (emphasis added); *Nevadans for Prop. Rights v. Sec'y of State*, 122 Nev. 894, 912, 141 P.3d 1235, 1247 (2006) (indicating that this court "must make every effort to sustain and preserve the people's . . . initiative process").

The Committee's own arguments regarding the multitude of issues it believes must be spelled out in an initiative's description of effect illustrate this point. For example, the Committee argues that the Initiative's description of effect misstates how certain tax revenues generated by the margin tax would be used by stating that "[r]evenues from the tax would be deposited in the State Distributive School Account" without noting that a portion of these funds will be used to fund the Department of Taxation's costs of administrating the tax. We disagree. The description of effect recites that the modified business tax ". . . would temporarily be increased . . . to provide money for the Department of Taxation to begin to administer the margin tax." This statement recognizes the need for the Initiative to provide the Department of Taxation with enough money to cover the administrative costs of the margin tax. *See* Nev. Const. art. 19, § 6. With the description of effect limited to a mere 200 words, expecting this description to state specifically that a fraction of the revenue generated by the tax will be used for administering the tax would be unreasonable. Moreover, as all statutes enacted by initiative must be self-funding, the inclusion of this information is wholly unnecessary and its omission does not render the description misleading or incorrect.

The Committee's additional arguments focus on omissions that it believes should have been included in the description of effect, specifically the amount of revenue to be generated by the margin tax, the fact that even unprofitable businesses will be required to pay the tax,[7] the fact that businesses subject to the tax might incur compliance costs, the absence of explanations of the meaning of certain key terms, such as "total revenue" and "cost of goods it has sold" as used in the Initiative, the fact that, if enacted, the law will not be capable of amendment or repeal for at least three years, and an explanation of why the modified business tax might increase from 2.29 percent to 2.42 percent. While this is all in-

---

[7]We note that the description of effect plainly explains that businesses with annual "revenue" of more than $1 million will be subject to the margin tax. Thus, if only by implication, the description of effect already informs petition signers that unprofitable businesses will be subject to the tax.

formation that may ultimately be useful for voters, in light of the 200-word limit placed on descriptions of effect, such a level of detail far exceeds what a proponent can constitutionally be required to include in a description of effect. *See* Nev. Const. art. 19, § 5; *Nevadans for Prop. Rights*, 122 Nev. at 912, 141 P.3d at 1247.

Most ballot initiatives will have a number of different effects if enacted, many of which are hypothetical in nature. We have previously rejected the notion that a description of effect must explain "hypothetical" effects. *See Herbst Gaming*, 122 Nev. at 889, 141 P.3d at 1232. Thus, if we were to give credence to the Committee's application of the description of effect requirement, any opponent of a ballot initiative could identify some perceived effect of an initiative that is not explained by the description of effect, challenge the initiative in district court, and block the people's right to the initiative process. Statutes enacted to facilitate the initiative process cannot be interpreted so strictly as to halt the process.

*A district court must not apply statutory interpretation principles when examining a description of effect*

In addition to its errant belief that a description of effect must highlight every nuance and effect of an initiative, the Committee also maintained that the Initiative's description of effect was misleading with regard to the Initiative's overall impact on education funding. The Committee's argument in this regard was based on the description of effect's following sentence: "Revenues from the tax would be deposited in the State Distributive School Account in the State General Fund, and used for the support of K-12 education." By using the word "support," the Committee contended that this sentence suggests to petition signers that margin tax revenues will increase existing education funding. Focusing on what it believed to be a likely outcome of the influx of new education funds from the margin tax enacted by the Initiative, the Committee asserted that the description of effect is misleading because it does not clarify that margin tax revenues may serve only to *replace* existing education funds if the Legislature chooses to spend the existing funds elsewhere.

In response, EI PAC ascribed a more colloquial meaning to the word "support" and maintained that the sentence is accurate: the revenues generated from the margin tax will indeed be deposited in the Distributive School Account and will certainly be used to "support," or fund, K-12 education. Thus, according to EI PAC, because the sentence does not mislead petition signers into believing that funding for education will necessarily increase, its otherwise straightforward, succinct, and nonargumentative description

of effect does not need to explain a hypothetical scenario in which the Legislature chooses to reallocate existing funds.

The district court agreed with the Committee. Specifically, it concluded that the margin tax's effect ''is to free up funds for the Legislature to use as it wishes, for education or non-education purposes.'' Without explaining why the description of effect, as written, is necessarily misleading in this regard, the district court concluded that this effect is ''something those being asked to sign the petition should know'' and that the description of effect's failure to provide such an explanation renders it ''deceptive and misleading.''

The parties' efforts to advance their respective meanings for the word ''support'' and the district court's conclusion that the description of effect's use of that word is misleading are grounded in the idea that a reviewing court should apply principles of statutory construction in examining information articulated in a description of effect. Given the limited function ascribed to an initiative's description of effect and the fact that these descriptions are relevant only at the early stages of the initiative process, we conclude that it is inappropriate to parse the meanings of the words and phrases used in a description of effect as closely as we would statutory text. Such exacting scrutiny comes at too high a price in that it carries the risk of depriving the people of Nevada of their constitutional right to propose laws by initiative, something this court has expressly stated that it will not do. *Nevadans for Prop. Rights*, 122 Nev. at 912, 141 P.3d at 1247.

We therefore conclude that, when reviewing a description of effect, the district court must take a holistic approach to determine whether the description is a straightforward, succinct, and nonargumentative summary of an initiative's purpose and how that purpose is achieved, *Las Vegas Taxpayer Comm. v. City Council*, 125 Nev. 165, 183, 208 P.3d 429, 441 (2009), and whether the information contained in the description is correct and does not misrepresent what the initiative will accomplish and how it intends to achieve those goals. *Stumpf v. Lau*, 108 Nev. 826, 833, 839 P.2d 120, 124 (1992).

Here, a review of the description of effect makes clear that the Initiative is designed to provide funding for education, and the Committee itself acknowledges that the margin tax revenues will be used in some way to fund K-12 education. The Committee's attempt to give meaning to the word ''support'' is founded entirely on a hypothetical scenario that the Committee believes may occur—that education funding may not increase because the Legislature may choose to use the margin tax revenues to simply replace the existing funds it otherwise would have had to place into

the Distributive School Account.[8] The Committee's hypothetical, however, to provide meaning for the word "support" does not provide a valid basis for concluding that the Initiative's description of effect is inadequate.

Given the early stages of the initiative process at which a description of effect is relevant and the fact that these descriptions are, by necessity, merely short summaries detailing what an initiative is designed to achieve and how it will do so, a district court examining a description of effect must determine whether the description provides an expansive view of the initiative, rather than undertaking a hyper-technical examination of whether the description covers each and every aspect of the initiative. To that end, a statutory interpretation-style construction of the description, in which the meaning and purpose of each word and phrase contained in the description of effect are examined, is not appropriate.

As a whole, our review of the Initiative's description of effect reveals that it provides a straightforward, succinct, and nonargumentative summary of what the Initiative is designed to achieve—raise funds to support Nevada's K-12 public schools—and how it intends to do so—enacting a margin tax. The information contained in the description is neither deceptive nor misleading, as it is substantively correct and does not misrepresent what the initiative will accomplish or how it will achieve those goals. As a result, we conclude that the Committee's arguments regarding the description of effect's insufficiency lack merit and, to the extent the district court

---

[8]At oral argument, the Committee made several unsupported assertions that the Legislature would be legally compelled to reduce its funding of the Distributive School Account in an amount equal to the margin tax revenues deposited therein. Our independent review of the "Nevada Plan," however, reveals that these assertions are questionable at best. To fulfill its constitutional obligation to fund education, the Legislature created the Nevada Plan, a statutory scheme setting forth the process by which it determines the biennial funding for education. The Nevada Plan assumes certain local money will be "reasonably available" to fund education and envisions funding from three funding sources: local taxes consisting primarily of property taxes, local funds consisting of a portion of the same property taxes and separate sales taxes, and state funds. NRS 387.121; NRS 387.1235(1); NRS 387.195. In addition to financing the State's own share, the Legislature is required to "guarantee" a shortfall in local funds when the local funds are less than projected. NRS 387.121. To be sure, the Nevada Plan does not envision an influx of new revenue being deposited into the Distributive School Account, meaning that it is not entirely clear what the Legislature or the Superintendent of Public Instruction would be authorized to do with the margin tax revenues. By the same token, however, the Nevada Plan's failure to account for a new revenue source means that nothing in the current Plan *compels* the Legislature to reduce its "guarantee" in the manner suggested by the Committee.

relied on them to invalidate the Initiative, that conclusion was in error and must be reversed.[9] *Nevadans for Nevada v. Beers*, 122 Nev. 930, 942, 142 P.3d 339, 347 (2006).

*The Initiative complies with NRS 295.009(1)(a)'s single-subject requirement*

The final issue that we reach in this appeal concerns the single-subject rule. NRS 295.009(1)(a) requires that a law being proposed by ballot initiative embrace only "one subject and matters necessarily connected therewith and pertaining thereto." The Legislature has clarified that a ballot initiative satisfies the single-subject requirement when the initiative's proposed parts are " 'functionally related' and 'germane' to each other and the initiative's purpose or subject." *Las Vegas Taxpayer Comm.*, 125 Nev. at 180, 208 P.3d at 439 (quoting NRS 295.009(2)). Thus, in order to determine whether a ballot initiative's parts are "functionally related" and "germane" to each other and the initiative's purpose, this court must first determine the Initiative's primary purpose. *Id.*

### Initiative's primary purpose

EI PAC maintains that the purpose of its Initiative is to fund public education. The Committee counters that this is not the Initiative's true purpose, as once the margin tax revenues are deposited into the Distributive School Account, the Initiative does nothing to ensure that they will be used to increase education funding. The Committee posits that the effect of the Initiative may be to provide the Legislature with a larger general fund if it chooses to let the margin tax revenues cover its education funding requirements and uses the funds it would have otherwise been required to provide for education for other purposes.

A review of the Initiative substantiates EI PAC's stance, as the Initiative expressly provides that the newly generated margin tax revenues must be deposited into the Distributive School Account. Since the Distributive School Account is the account that the Legislature uses to allocate money to cover the State's obligation for funding K-12 education, the Initiative's textual language demonstrates that its purpose is to fund public education. *Las Vegas Taxpayer Comm.*, 125 Nev. at 180, 208 P.3d at 439 (determining a ballot initiative's purpose by considering the initiative's "textual language and the proponents' arguments"). We have little trouble in rejecting the Committee's argument, as it confuses "purpose"

---

[9]To the extent that the district court rejected certain arguments by the Committee pertaining to the description of effect, we affirm the district court's determination.

with "effect." The Committee is once again seeking to invalidate the Initiative by using a hypothetical, something we have previously declared to be impermissible. *Herbst Gaming*, 122 Nev. at 889, 141 P.3d at 1232. The Initiative's primary purpose is clearly to fund education.

*The Initiative's parts are functionally related and germane to each other and the Initiative's purpose*

The Committee's assertion that the Initiative violates the single-subject rule because it seeks to implement a new margin tax *and* temporarily increase the existing modified business tax is without merit. As previously explained, EI PAC's Initiative is constitutionally required to be self-funding, *see* Nev. Const. art. 19, § 6, meaning that it must provide the Department of Taxation with enough money to cover its costs of administrating the margin tax. Thus, EI PAC's Initiative also seeks to provide the funding that the Department of Taxation will need to administer and enforce the margin tax. To do so, the Initiative provides for a necessary portion of the margin tax revenues to be allocated each year to the Department of Taxation. Once these revenues are allocated, all remaining revenues are to be deposited into the Distributive School Account. Since the Department of Taxation will necessarily incur administrative costs before margin tax revenues start accruing, the Initiative seeks to temporarily increase a different tax, the modified business tax (or "[p]ayroll tax," *see* NRS 363A.130), imposed on all Nevada financial institutions. Thus, although the Initiative does seek to implement a new tax and temporarily increase an existing tax, both taxes are functionally related and germane to the Initiative's clear purpose of funding public education. Accordingly, EI PAC's Initiative complies with NRS 295.009(1)(a)'s single-subject requirement, and the district court properly rejected this argument.

## CONCLUSION

A description of effect need not articulate every detail and possible effect that an initiative may have. Instead, given that these descriptions are utilized only in the early, signature-gathering phase of the initiative process and that descriptions of effect are limited to 200 words, they need only provide a straightforward, succinct, and nonargumentative summary of what an initiative is designed to achieve and how it intends to reach those goals. Because the description of effect at issue here complied with these requirements, the district court erred in concluding that the Initiative's description of effect was "incomplete, deceptive, [and] misleading" and invalidating the Initiative on that basis. As the Committee's remaining arguments against the Initiative lack merit, we reverse the dis-

trict court's grant of declaratory relief invalidating the Initiative and its decision to enjoin the Secretary of State from presenting the Initiative to the 2013 Legislature and from placing it on the 2014 general election ballot.

PICKERING, C.J., and GIBBONS, PARRAGUIRRE, DOUGLAS, CHERRY, and SAITTA, JJ., concur.

# ADDENDUM

*Initiative Petition - Statewide Statutory Measure*                    *State of Nevada*

## THE EDUCATION INITIATIVE

Explanation: Language in **boldface italics** is to be added to Nevada Revised Statutes, language between brackets [deleted language] is to be deleted

### THE PEOPLE OF THE STATE OF NEVADA DO ENACT AS FOLLOWS:

**Section 1.** This act provides for the imposition of a margin tax on business entities engaged in business in this State, and requires that the proceeds of the tax be used to fund the operation of the public schools in this State for kindergarten through grade 12.

**Sec. 2.** Title 32 of NRS is hereby amended by adding thereto a new chapter to consist of the provisions set forth as sections 3 to 45, inclusive, of this act.

**Sec. 3.** *As used in this chapter, unless the context otherwise requires, the words and terms defined in sections 4 to 17, inclusive, of this act have the meanings ascribed to them in those sections.*

**Sec. 4.** *"Affiliated group" means a group of two or more business entities, each of which is controlled by one or more common owners or by one or more of the members of the group.*

**Sec. 5.** *"Business" means any activity engaged in or caused to be engaged in with the object of gain, benefit or advantage, either direct or indirect, to any person or governmental entity.*

**Sec. 6.** *1. Except as otherwise provided in this section, "business entity" means a corporation, partnership, proprietorship, limited-liability company, business association, joint venture, limited-liability partnership, business trust, professional association, joint stock company, holding company and any other person engaging in a business, and includes a combined group.*
*2. "Business entity" does not include:*
*(a) A natural person unless that person is engaging in a business and is required to file with the Internal Revenue Service a Schedule C (Form 1040), Profit or Loss From Business, or its equivalent or successor form, a Schedule E (Form 1040), Supplemental Income and Loss, or its equivalent or successor form, or a Schedule F (Form 1040), Profit or Loss From Farming, or its equivalent or successor form, for that business;*
*(b) A governmental entity;*
*(c) Any person or other entity that this State is prohibited from taxing under the Constitution, laws or treaties of the United States or the Nevada Constitution; or*
*(d) Any credit union that is authorized to transact business in this State pursuant to the provisions of chapter 678 of NRS.*

**Sec. 7.** *"Combined group" means an affiliated group of business entities that is required to file a group return pursuant to section 27 of this act.*

**Sec. 8.** *"Commission" means the Nevada Tax Commission.*

**Sec. 9.** *"Controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a business entity, whether through the ownership of voting securities, by contract or otherwise.*

**Sec. 10.** *"Engaging in a business" means commencing, conducting or continuing a business, the exercise of corporate or franchise powers regarding a business, and the liquidation of a business which is or was engaging in a business when the liquidator holds itself out to the public as conducting that business.* .

**Sec. 11.** *"Governmental entity" means:*
*1. The United States and any of its unincorporated agencies and instrumentalities.*
*2. Any incorporated agency or instrumentality of the United States wholly owned by the United States or by a corporation wholly owned by the United States.*
*3. The State of Nevada and any of its unincorporated agencies and instrumentalities.*
*4. Any county, city, district or other political subdivision of this State.*

**Sec. 12.** *"Lending institution" means an entity that makes loans and:*
*1. Is regulated by the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Commodity Futures Trading Commission, the Office of Thrift Supervision or any comparable regulatory body;*
*2. Is licensed by, registered with or otherwise regulated by the Commissioner of Financial Institutions;*
*3. Is a "broker" or "dealer" as defined in 15 U.S.C. § 78c; or*
*4. Provides financing to unrelated parties solely for agricultural production.*

**Sec. 13.** *"Pass-through revenue" means:*
1. *Revenue received by a business entity solely on behalf of another in a disclosed agency capacity, including, without limitation, revenue received as a broker, bailee, consignee or auctioneer, notwithstanding that the business entity may incur liability, primarily or secondarily, in a transaction in its capacity as an agent;*
2. *Taxes collected from a third party by a business entity and remitted by the business entity to a taxing authority; and*
3. *Reimbursement for advances made by a business entity on behalf of a customer or client, other than with respect to services rendered or with respect to purchases of goods by the business entity in carrying out the business in which it engages.*

**Sec. 14.** *"Taxable year" means the taxable year used by a business entity for the purposes of federal income taxation.*

**Sec. 15.** *"Total income" means the total amount received by a business entity from all sources, without subtracting any costs or expenses.*

**Sec. 16.** *"Total revenue" means the total revenue of a business entity as determined under section 24 of this act.*

**Sec. 17.** *"Unitary business" means a business characterized by unity of ownership, functional integration, centralization of management and economy of scale.*

**Sec. 18.** *1. For the purposes of this chapter, an entity constitutes a "passive entity" only if:*
*(a) The entity is a general partnership, limited partnership, limited-liability partnership or limited-liability limited partnership or a trust, other than a business trust; and*
*(b) During the period on which margin is based, at least 90 percent of the entity's federal gross income consists of:*
*(1) Dividends or interest; and*
*(2) Royalties, bonuses or delay rental income from mineral properties and income from other nonoperating mineral interests.*
*2. The income described in paragraph (b) of subsection 1 does not include any:*
*(a) Rent; or*
*(b) Income received by a nonoperator from mineral properties under a joint operating agreement if the nonoperator is a member of an affiliated group and another member of that group is the operator under that joint operating agreement.*

**Sec. 19.** *The Department shall:*
*1. Administer and enforce the provisions of this chapter, and may adopt such regulations as it deems appropriate for those purposes.*
*2. Adopt such regulations as may be necessary or appropriate to interpret and carry out the provisions of sections 24 and 27 of this act.*
*3. Retain from the proceeds of the taxes, interest and penalties it receives pursuant to this chapter an amount sufficient to reimburse the Department for the actual cost of administering this chapter, to the extent that the Department incurs any cost it would not have incurred but for the enactment of this chapter, and deposit the amount so retained with the State Treasurer for credit to the State General Fund. The amount so retained must not exceed the amount authorized by statute for this purpose.*
*4. Except as otherwise provided in subsection 3, deposit all taxes, interest and penalties it receives pursuant to this chapter in the State Distributive School Account in the State General Fund. The money so deposited must be apportioned among the several school districts and charter schools of this State at the times and in the manner provided by law for the money in the State Distributive School Account.*

**Sec. 20.** *1. Each person responsible for maintaining the records of a business entity shall:*
*(a) Keep such records as may be necessary to determine the amount of the liability of the business entity pursuant to the provisions of this chapter;*
*(b) Preserve those records for 4 years or until any litigation or prosecution pursuant to this chapter is finally determined, whichever is longer; and*
*(c) Make the records available for inspection by the Department upon demand at reasonable times during regular business hours.*
*2. The Department may by regulation specify the types of records which must be kept to determine the amount of the liability of a business entity pursuant to the provisions of this chapter.*
*3. Any person who violates the provisions of subsection 1 is guilty of a misdemeanor.*

**Sec. 21.** *1. To verify the accuracy of any return filed or, if no return is filed by a business entity, to determine the amount required to be paid, the Department, or any person authorized in writing by the Department, may examine the books, papers and records of any person who may be liable for the tax imposed by this chapter.*

2. *Any person who may be liable for the tax imposed by this chapter and who keeps outside of this State any books, papers and records relating thereto shall pay to the Department an amount equal to the allowance provided for state officers and employees generally while traveling outside of the State for each day or fraction thereof during which an employee of the Department is engaged in examining those documents, plus any other actual expenses incurred by the employee while he or she is absent from his or her regular place of employment to examine those documents.*

Sec. 22. 1. *Except as otherwise provided in this section, a margin tax is hereby imposed on each business entity that engages in a business in this State during any taxable year beginning on or after the effective date of this section, at the rate of 2 percent of the taxable margin of the business entity for the taxable year.*

2. *The margin tax extends to the limits of the Nevada Constitution, the Constitution of the United States and the federal law adopted under the United States Constitution.*

3. *A business entity is exempt from the margin tax imposed for each taxable year regarding which:*

(a) *The amount of the total revenue of the business entity from its entire business is less than or equal to $1,000,000, as determined under section 24 of this act;*

(b) *The business entity qualifies as a passive entity, as determined pursuant to section 18 of this act; or*

(c) *The business entity qualifies as a tax-exempt organization pursuant to 26 U.S.C. § 501(c).*

4. *A business entity that pays any tax imposed on the business entity pursuant to NRS 363A.130 or 363B.110 for any of the last four calendar quarters ending on or before the last day of a taxable year for which the margin tax is imposed pursuant to this section is entitled to a credit against the amount of the margin tax due from that business entity for that taxable year in the amount of the taxes paid by the business entity pursuant to NRS 363A.130 and 363B.110 for those calendar quarters, but not more than the amount of the margin tax due from the business entity for that taxable year.*

Sec. 23. 1. *Subject to the provisions of section 27 of this act, the taxable margin of a business entity must be computed by:*

(a) *Determining the business entity's margin, which is the lesser of 70 percent of the total revenue of the business entity from its entire business, as determined under section 24 of this act, or an amount computed by:*

(1) *Determining the total revenue of the business entity from its entire business under section 24 of this act; and*

(2) *Except as otherwise provided in subsection 2, subtracting from the amount determined under subparagraph (1), at the election of the business entity, either:*

(I) *The cost of goods sold, as determined under section 25 of this act; or*

(II) *The amount of compensation, as determined under section 26 of this act; and*

(b) *Apportioning the business entity's margin to this State as provided in section 28 of this act to determine the business entity's taxable margin.*

2. *An election under subparagraph (2) of paragraph (a) of subsection 1 must be made by a business entity on its annual return and is effective only for that annual return. A business entity shall notify the Department of its election not later than the date the annual return is due.*

3. *In making any computation under this section, an amount that is zero or less must be computed as zero.*

Sec. 24. 1. *Except as otherwise provided in this section and subject to the provisions of section 27 of this act, for the purpose of computing its taxable margin under section 23 of this act, the total revenue of a business entity is:*

(a) *For a business entity treated for the purposes of federal income taxation as a corporation, an amount computed by:*

(1) *Adding:*

(I) *The amount reportable as income on line 1c of Internal Revenue Service Form 1120; and*

(II) *The amounts reportable as income on lines 4 to 10, inclusive, of Internal Revenue Service Form 1120; and*

(2) *Subtracting:*

(I) *The amount of any bad debts expensed for the purposes of federal income taxation that corresponds to items of income included in subparagraph (1) for the current reporting period or a past reporting period;*

(II) *To the extent included in subparagraph (1), any foreign royalties and foreign dividends;*

(III) *To the extent included in subparagraph (1), any net distributive income from a business entity treated as a partnership or as an S corporation for the purposes of federal income taxation;*

(IV) *Any allowable deductions from Internal Revenue Service Form 1120, Schedule C, to the extent that the relating dividend income is included in total revenue;*

(V) *To the extent included in subparagraph (1), any items of income attributable to an entity that is a disregarded entity for the purposes of federal income taxation; and*

# 56

     *(VI) To the extent included in subparagraph (1), any other amounts authorized by this* section;

   *(b) For a business entity treated for the purposes of federal income taxation as a partnership, an amount computed by:*

    *(1) Adding:*

     *(I) The amount reportable as income on line 1c of Internal Revenue Service Form 1065;*

     *(II) The amounts reportable as income on lines 4, 6 and 7 of Internal Revenue Service Form 1065;*

     *(III) The amounts reportable as income on lines 3a and 5 to 11, inclusive, of Internal Revenue Service Form 1065, Schedule K;*

     *(IV) The amount reportable as income on line 17 of Internal Revenue Service Form 8825; and*

     *(V) The amount reportable as income on line 11, plus the amount reportable on line 2 or line 45, of Internal Revenue Service Form 1040, Schedule F; and*

    *(2) Subtracting:*

     *(I) The amount of any bad debts expensed for the purposes of federal income taxation that corresponds to items of income included in subparagraph (1) for the current reporting period or a past reporting period;*

     *(II) To the extent included in subparagraph (1), any foreign royalties and foreign dividends;*

     *(III) To the extent included in subparagraph (1), any net distributive income from a business entity treated as a partnership or as an S corporation for the purposes of federal income taxation;*

     *(IV) To the extent included in subparagraph (1), any items of income attributable to an entity that is a disregarded entity for the purposes of federal income taxation; and*

     *(V) To the extent included in subparagraph (1), any other amounts authorized by this* section; or

   *(c) For any business entity other than a business entity treated for the purposes of federal income taxation as a corporation or partnership, an amount determined in a manner substantially equivalent to the amount determined under paragraph (a) or (b), as prescribed in regulations adopted by the Department.*

  *2. Subject to the provisions of section 27 of this act, a business entity that is part of a federal consolidated group shall compute its total revenue under subsection 1 as if it had filed a separate return for the purposes of federal income taxation.*

  *3. A business entity that owns an interest in a passive entity may exclude from the total revenue of the business entity the business entity's share of the net income of the passive entity, but only to the extent the net income of the passive entity was generated by the margin of any other business entity.*

  *4. Except as otherwise provided in subsection 5, to the extent included under subparagraph (1) of paragraph (a) of subsection 1, subparagraph (1) of paragraph (b) of subsection 1 or paragraph (c) of subsection 1:*

   *(a) A business entity may exclude from its total revenue:*

    *(1) The amount of any pass-through revenue of the business entity; and*

    *(2) The amount of tax basis, as determined under the Internal Revenue Code and any regulations adopted pursuant thereto, of any securities and loans sold; and*

   *(b) A business entity that is a lending institution may exclude from its total revenue the amount of any proceeds from the principal repayment of loans.*

  *5. If a business entity is part of an affiliated group, the business entity may not exclude from its total revenue any of the amounts described in subsection 4 which are paid to entities that are members of the affiliated group.*

  *6. To the extent included under subparagraph (1) of paragraph (a) of subsection 1, subparagraph (1) of paragraph (b) of subsection 1 or paragraph (c) of subsection 1:*

   *(a) A business entity may exclude from its total revenue the amount of any revenue attributable to dividends and interest upon any bonds or securities of the Federal Government, the State of Nevada or a political subdivision of this State.*

   *(b) A business entity that is required to pay a license fee pursuant to NRS 463.370 may exclude from its total revenue the amount of its gross revenue used to determine the amount of that fee.*

  *7. Any amount excluded under this section from the total revenue of a business entity must not be included in the determination of the cost of goods sold under section 25 of this act or the determination of the amount of compensation under section 26 of this act.*

  *8. For the purposes of this section, any reference to:*

   *(a) An Internal Revenue Service form includes any variant of the form and any subsequent form with a different number or designation that substantially provides the same information as the original form.*

   *(b) An amount reportable as income on a line number of an Internal Revenue Service form means the amount entered to the extent the amount entered complies with federal income tax law and includes the corresponding amount entered on a variant of the form or subsequent form with a different line number to the extent the amount entered complies with federal income tax law.*

Sec. 25.　*1. Subject to the provisions of section 27 of this act, a business entity that elects to subtract the cost of goods sold for the purpose of computing its taxable margin under section 23 of this act must determine the amount of that cost as provided in this section.*

*2. Except as otherwise provided in this section, the cost of goods sold includes:*

*(a) All direct costs of acquiring or producing the goods, including:*

*(1) Labor costs;*

*(2) The cost of materials that are an integral part of the specific property produced;*

*(3) The cost of materials that are consumed in the ordinary course of performing production activities;*

*(4) Handling costs, including costs attributable to processing, assembling, repackaging and transportation to the business entity;*

*(5) Storage costs, including the costs of carrying, storing or warehousing property;*

*(6) Depreciation, depletion and amortization, as reported on the federal income tax return on which the return under this chapter is based, to the extent associated with and necessary for the production of the goods;*

*(7) The cost of renting or leasing equipment, facilities or real property which is directly used for the production of the goods;*

*(8) The cost of repairing and maintaining equipment, facilities or real property which is directly used for the production of the goods;*

*(9) The costs attributable to any research, experimental, engineering or design activities directly related to the production of the goods;*

*(10) Taxes paid in relation to acquiring or producing any material, and taxes paid in relation to services that are a direct cost of production; and*

*(11) The cost of producing or acquiring any electricity sold; and*

*(b) The following costs in relation to the business entity's goods:*

*(1) Deterioration of the goods;*

*(2) Obsolescence of the goods;*

*(3) Spoilage and abandonment of the goods, including the costs of rework labor, reclamation and scrap;*

*(4) If the property is held for future production, the direct costs of preproduction allocable to the property;*

*(5) The direct costs of postproduction allocable to the property;*

*(6) The costs of insurance on any plant, facility, machinery, equipment or materials directly used in the production of the goods;*

*(7) The cost of insurance on the produced goods;*

*(8) The cost of utilities, including any electricity, gas and water, directly used in the production of the goods;*

*(9) The costs of quality control, including any replacement of defective components pursuant to standard warranty policies, inspection directly allocable to the production of the goods, and repairs and maintenance of the goods; and*

*(10) Licensing and franchise costs, including any fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe or other similar right directly associated with the goods produced.*

*3. The cost of goods sold does not include the following costs in relation to the business entity's goods:*

*(a) The cost of renting or leasing any equipment, facilities or real property that is not used for the production of the goods;*

*(b) Selling costs, including employee expenses relating to sales;*

*(c) Distribution costs;*

*(d) Advertising and marketing costs;*

*(e) Expenses for idle facilities;*

*(f) Rehandling costs;*

*(g) Bidding costs incurred in the solicitation of contracts, whether or not the contracts are ultimately awarded to the business entity;*

*(h) Interest, including interest on debt incurred or continued during the period of production of the goods to finance such production;*

*(i) Any taxes assessed on the business entity based on income;*

*(j) Strike or lockout expenses, except the wages of employees hired to replace striking personnel;*

*(k) Compensation of directors, officers and consultants;*

*(l) Dividends to shareholders or distributions to members or partners which are business entities;*

*(m) Professional fees and costs of litigation;*

*(n) Fines, damages or restitution paid pursuant to judgments, consent decrees or settlements of legal actions including arbitration; and*

*(o) Any of the amounts described in subsection 2 which are paid to entities that are members of an affiliated group of which the business entity is a part.*

*4. For the purposes of this section and section 23 of this act, and subject to the provisions of section 27 of this act, a business entity:*

*(a) May make a subtraction in relation to the cost of goods sold only if that entity owns those goods.*

*(b) Must determine its cost of goods sold in accordance with the methods used on the federal income tax return on which is based the return under this chapter. This paragraph does not affect the type or category of cost of goods sold that may be subtracted in accordance with this section to compute the taxable margin of a business entity.*

*5. As used in this section:*

*(a) "Goods" means real property or tangible personal property sold in the ordinary course of business of a business entity.*

*(b) "Production" includes construction, installation, manufacture, development, extraction, improvement, creation, raising or growth.*

Sec. 26. *1. Except as otherwise provided in this section and subject to the provisions of section 27 of this act, a business entity that elects to subtract the amount of compensation for the purpose of computing its taxable margin under section 23 of this act may subtract an amount equal to:*

*(a) All wages, salaries and bonuses paid by the business entity to its officers, directors, owners, partners and employees who are natural persons; and*

*(b) The cost of all benefits, to the extent deductible for the purposes of federal income taxation, the business entity provides to its officers, directors, owners, partners and employees, including retirement, health care, employer contributions made to employees' health savings accounts and workers' compensation benefits.*

*2. Notwithstanding the actual amount of wages, salaries and bonuses paid by a business entity to its officers, directors, owners, partners and employees, a business entity may not include in the amount of wages, salaries and bonuses the business entity subtracts pursuant to paragraph (a) of subsection 1, in relation to each individual person, more than $300,000 per taxable year on which margin is based. If a person is paid by more than one entity of a combined group, the combined group may not subtract pursuant to paragraph (a) of subsection 1, in relation to that person, a total of more than $300,000 per taxable year on which margin is based.*

*3. As used in this section:*

*(a) Except as otherwise provided in paragraph (b), "wages, salaries and bonuses means the amount entered in the Medicare wages and tips box of Internal Revenue Service Form W-2 or any subsequent form with a different number or designation that substantially provides the same information.*

*(b) "Wages, salaries and bonuses" includes, to the extent not included in the amount described in paragraph (a), the amount of any:*

*(1) Net distributive income from a business entity treated as a partnership for the purposes of federal income taxation, but only if the person receiving the distribution is a natural person;*

*(2) Net distributive income from limited-liability companies and corporations treated as S corporations for the purposes of federal income taxation, but only if the person receiving the distribution is a natural person; and*

*(3) Net distributive income from a limited-liability company treated as a sole proprietorship for the purposes of federal income taxation, but only if the person receiving the distribution is a natural person.*

Sec. 27. *1. Business entities that are part of an affiliated group engaged in a unitary business must file, in lieu of individual returns, a combined group return based on the combined group's business. The combined group:*

*(a) Must not include a business entity that conducts business outside of the United States if, as determined in accordance with regulations adopted by the Department:*

*(1) Eighty percent or more of that business entity's property and payroll are allocable to locations outside of the United States; or*

*(2) That business entity has no property or payroll and 80 percent or more of the business entity's total income is allocable to locations outside of the United States.*

*(b) Constitutes a single business entity for purposes of the application of the tax imposed by this chapter.*

*2. For the purposes of section 23 of this act, a combined group shall determine its total revenue by:*

*(a) Determining the total revenue of each of its members as provided in section 24 of this act as if the member was an individual business entity;*

*(b) Adding the total revenue of all its members determined under paragraph (a); and*

*(c) Subtracting from the amount determined under paragraph (b), to the extent included under subparagraph (1) of paragraph (a) of subsection 1 of section 24 of this act, subparagraph (1) of paragraph (b) of subsection 1 of section 24 of this act or paragraph (c) of subsection 1 of section 24 of this act, any items of total revenue received from a member of the combined group.*

*3. For the purposes of section 23 of this act, a combined group shall make an election to subtract either the cost of goods sold or the amount of compensation that applies to all of its members. Regardless of the election, the taxable margin of the combined group may not exceed 70 percent of the combined group's total revenue from its entire business.*

*4. A member of a combined group may claim as the cost of goods sold those costs that qualify under section 25 of this act if the goods for which the costs are incurred are owned by another member of the combined group.*

5.  For the purposes of section 23 of this act, a combined group that elects to subtract:

    (a) The cost of goods sold must determine that amount by:

    (1) Determining the cost of goods sold for each of its members as provided in section 25 of this act as if the member was an individual business entity;

    (2) Adding all the amounts of the costs of goods sold determined under subparagraph (1); and

    (3) Subtracting from the amount determined under subparagraph (2) any amount of the costs of goods sold paid from one member of the combined group to another member of the combined group, but only to the extent that the corresponding item of total revenue was subtracted under paragraph (c) of subsection 2.

    (b) The amount of compensation must determine that amount by:

    (1) Determining the amount of compensation for each of its members as provided in section 26 of this act as if the member was an individual business entity, subject to the limitation set forth in subsection 2 of section 26 of this act;

    (2) Adding all the amounts of compensations determined under subparagraph (1); and

    (3) Subtracting from the amount determined under subparagraph (2) any amount of compensation paid from one member of the combined group to another member of the combined group, but only to the extent that the corresponding item of total revenue was subtracted under paragraph (c) of subsection 2.

    6.  Each business entity that is part of a combined group's return must, for the purposes of determining margin and apportionment, include its activities for the same period as that used by the combined group.

    7.  Each member of a combined group is jointly and severally liable for the tax of the combined group.

Sec. 28.   1.  A business entity's margin must be apportioned to this State to determine the amount of tax imposed by section 22 of this act by multiplying the margin by a fraction, the numerator of which is the business entity's total income from business done in this State, as determined under section 29 of this act, and the denominator of which is the business entity's total income from its entire business, as determined under section 30 of this act.

    2.  For the purpose of apportioning margin:

    (a) Income excluded from total revenue by a business entity under section 24 of this act must not be included in either the total income of the business entity from its business done in this State as determined under section 29 of this act or the total income of the business entity from its entire business as determined under section 30 of this act.

    (b) Income derived from transactions between individual members of a combined group that are excluded under paragraph (c) of subsection 2 of section 27 of this act must not be included in:

    (1) The total income of the business entity from its business done in this State as determined under section 29 of this act, except that income ultimately derived from the sale of tangible personal property between individual members of a combined group where one member party to the transaction does not have nexus in this State must be included in the total income of the business entity from its business done in this State as determined under section 29 of this act to the extent that the member of the combined group that does not have nexus in this State resells the tangible personal property without substantial modification to a purchaser in this State. For the purposes of this subsection, "income ultimately derived from the sale of tangible personal property" means the amount paid for the tangible personal property by the third-party purchaser.

    (2) The total income of the business entity from its entire business as determined under section 30 of this act.

    (c) Notwithstanding any provision of paragraph (a) or (b) to the contrary, if a loan or security is treated as inventory of the seller for the purposes of federal income taxation, the gross proceeds of the sale of that loan or security are considered total income.

Sec. 29.   1.  Subject to the provisions of section 28 of this act, in apportioning margin, the total income of a business entity from its business done in this State is the sum of the business entity's total income from:

    (a) Each sale of tangible personal property which is delivered or shipped to a buyer in this State, regardless of the specified terms and conditions of the sale;

    (b) Each service performed in this State;

    (c) Each rental of property situated in this State;

    (d) The use of a patent, copyright, trademark, franchise or license in this State;

    (e) Each sale of real property located in this State, including royalties from oil, gas or other mineral interests; and

    (f) Any other business done in this State.

    2.  For the purposes of paragraph (b) of subsection 1, the total income derived from servicing loans secured by real property shall be deemed to be performed in this State if the real property is located in this State.

    3.  A combined group shall include in its total income computed under subsection 1 the total income of each business entity that is a member of the combined group which has a nexus in this State for the purpose of taxation.

Sec. 30.   _1.  Subject to the provisions of section 28 of this act, in apportioning margin, the total income of a business entity from its entire business is the sum of the business entity's total income from:_
_(a) Each sale of the business entity's tangible personal property;_
_(b) Each service, rental or royalty; and_
_(c) Any other business._
_2.  If a business entity sells an investment or capital asset, the business entity's total income from its entire business for taxable margin includes only the net gain from the sale._
_3.  A combined group shall include in its total income computed under subsection 1 the total income of each business entity that is a member of the combined group, without regard to whether that entity has a nexus with this State for the purpose of taxation._

Sec. 31.   _1.  A business entity shall use the same accounting methods to apportion margin as used in computing margin._
_2.  A business entity may not change its accounting methods used to calculate its total income more often than once every 4 years without the express written consent of the Department. A change in accounting methods is not justified solely because the change results in a reduction of tax liability._

Sec. 32.   _1.  The tax imposed by this chapter for each taxable year is due on the last day of the calendar month following that taxable year._
_2.  Except as otherwise provided in this chapter, each business entity engaging in a business in this State during a taxable year that is not exempt from the tax imposed by this chapter for that taxable year shall file with the Department a return on a form prescribed by the Department, together with the remittance of any tax due pursuant to this chapter for that taxable year, not later than 30 days after the date the business entity is required to file its federal income tax return for that taxable year with the Internal Revenue Service. The return required by this subsection must be executed under penalty of perjury and include the taxpayer identification number or social security number of the business entity, as applicable, and such other information as is required by the Department._

Sec. 33.   _Upon written application made before the date on which a business entity is otherwise required to file a return and pay the tax imposed by this chapter, the Department may:_
_1.  If the business entity is granted an extension of time by the Federal Government for the filing of its federal income tax return, extend the time for filing the return required by this chapter until not later than 30 days after the date the business entity is required to file its federal income tax return pursuant to the extension of time granted by the Federal Government. The Department may require, as a condition to the granting of any extension pursuant to this subsection, the payment of the tax estimated to be due pursuant to this chapter._
_2.  For good cause extend by 30 days the time within which the business entity is required to pay the tax. If the tax is paid during a period of extension granted pursuant to this subsection, no penalty or late charge may be imposed for failure to pay at the time required, but the business entity shall pay interest at the rate of 1 percent per month from the date on which the amount would have been due without the extension until the date of payment, unless otherwise provided in NRS 360.232 or 360.320._

Sec. 34.   _1.  If the taxable margin of a business entity changes as a result of:_
_(a) The filing by the business entity of an amended federal income tax return or other return, the business entity shall, within 30 days after that filing, file an amended return with the Department._
_(b) An audit or other adjustment by the Internal Revenue Service or another competent authority, the business entity shall, within 30 days after the audit report or other adjustment becomes final, file an amended return with the Department._
_2.  If, based upon an amended return filed pursuant to this section, it appears that the tax imposed by this chapter has not been fully assessed, the Department shall assess the deficiency, with interest calculated at the rate and in the manner set forth in NRS 360.417. Any assessment required by this subsection must be made within 3 years after the Department receives the amended return._

Sec. 35.   _If the Department determines that any tax, penalty or interest has been paid more than once or has been erroneously collected or computed, the Department shall set forth that fact in the records of the Department and certify to the State Board of Examiners the amount collected in excess of the amount legally due and the person from whom it was collected or by whom it was paid. If approved by the State Board of Examiners, the excess amount collected or paid must, after being credited against any amount then due from the person in accordance with NRS 360.236, be refunded to the person or his or her successors in interest._

Sec. 36.   _1.  Except as otherwise provided in NRS 360.235 and 360.395:_
_(a) No refund may be allowed unless a claim for it is filed with the Department within 3 years after the last day of the month following the taxable year for which the overpayment was made._
_(b) No credit may be allowed after the expiration of the period specified for filing claims for refund unless a claim for credit is filed with the Department within that period._
_2.  Each claim must be in writing and must state the specific grounds upon which the claim is founded._
_3.  Failure to file a claim within the time prescribed in this chapter constitutes a waiver of any_

*demand against the State on account of overpayment.*

*4. Within 30 days after rejecting any claim in whole or in part, the Department shall serve notice of its action on the claimant in the manner prescribed for service of notice of a deficiency determination.*

Sec. 37. *1. No injunction, writ of mandate or other legal or equitable process may issue in any suit, action or proceeding in any court against this State or against any officer of this State to prevent or enjoin the collection under this chapter of the tax imposed by this chapter or any amount of tax, penalty or interest required to be collected.*

*2. No suit or proceeding may be maintained in any court for the recovery of any amount alleged to have been erroneously determined or collected unless a claim for refund or credit has been filed.*

Sec. 38. *1. Within 90 days after a final decision upon a claim filed pursuant to this chapter is rendered by the Commission, the claimant may bring an action against the Department on the grounds set forth in the claim in a court of competent jurisdiction in Carson City, the county of this State where the claimant resides or maintains his or her principal place of business or a county in which any relevant proceedings were conducted by the Department, for the recovery of the whole or any part of the amount with respect to which the claim has been disallowed.*

*2. Failure to bring an action within the time specified constitutes a waiver of any demand against the State on account of alleged overpayments.*

Sec. 39. *1. If the Department fails to mail notice of action on a claim within 6 months after the claim is filed, the claimant may consider the claim disallowed and file an appeal with the Commission within 30 days after the last day of the 6-month period. If the claimant is aggrieved by the decision of the Commission rendered on appeal, the claimant may, within 90 days after the decision is rendered, bring an action against the Department on the grounds set forth in the claim for the recovery of the whole or any part of the amount claimed as an overpayment.*

*2. If judgment is rendered for the plaintiff, the amount of the judgment must first be credited towards any tax due from the plaintiff.*

*3. The balance of the judgment must be refunded to the plaintiff.*

Sec. 40. *If the court finds that the Department acted arbitrarily or capriciously in denying the plaintiff's claim, interest on the amount refunded to the plaintiff may be allowed at the Federal Funds Target Rate, but no greater than 6 percent per annum, upon the amount refunded to the plaintiff from the date of payment of the amount to a date preceding the date of the refund warrant by not more than 30 days. The date must be determined by the Department.*

Sec. 41. *A judgment may not be rendered in favor of the plaintiff in any action brought against the Department to recover any amount paid when the action is brought by or in the name of an assignee of the person paying the amount or by any person other than the person who paid the amount.*

Sec. 42. *1. The Department may recover a refund or any part thereof which is erroneously made and any credit or part thereof which is erroneously allowed in an action brought in a court of competent jurisdiction in Carson City or Clark County in the name of the State of Nevada.*

*2. The action must be tried in Carson City or Clark County unless the court, with the consent of the Attorney General, orders a change of place of trial.*

*3. The Attorney General shall prosecute the action, and the provisions of NRS, the Nevada Rules of Civil Procedure and the Nevada Rules of Appellate Procedure relating to service of summons, pleadings, proofs, trials and appeals are applicable to the proceedings.*

Sec. 43. *1. If any amount in excess of $25 has been illegally determined, either by the Department or by the person filing the return, the Department shall certify this fact to the State Board of Examiners, and the latter shall authorize the cancellation of the amount upon the records of the Department.*

*2. If an amount not exceeding $25 has been illegally determined, either by the Department or by the person filing the return, the Department, without certifying this fact to the State Board of Examiners, shall authorize the cancellation of the amount upon the records of the Department.*

Sec. 44. *1. A person shall not:*

*(a) Make, cause to be made or permit to be made any false or fraudulent return or declaration or false statement in any return or declaration with intent to defraud the State or to evade payment of the tax or any part of the tax imposed by this chapter.*

*(b) Make, cause to be made or permit to be made any false entry in books, records or accounts with intent to defraud the State or to evade the payment of the tax or any part of the tax imposed by this chapter.*

*(c) Keep, cause to be kept or permit to be kept more than one set of books, records or accounts with intent to defraud the State or to evade the payment of the tax or any part of the tax imposed by this chapter.*

*2. Any person who violates the provisions of subsection 1 is guilty of a gross misdemeanor.*

Sec. 45. *The remedies of the State provided for in this chapter are cumulative, and no action taken by the Department or the Attorney General constitutes an election by the State to pursue any remedy to the exclusion of any other remedy for which provision is made in this chapter.*

Sec. 46. NRS 360.2937 is hereby amended to read as follows:

360.2937  1. Except as otherwise provided in this section, NRS 360.320 or any other specific statute, and notwithstanding the provisions of NRS 360.2935, interest must be paid upon an overpayment of any tax provided for in chapter 362, 363A, 363B, 369, 370, 372, 374, 377 or 377A of NRS [,] *or sections 3 to 45, inclusive, of this act,* any fee provided for in NRS 444A.090 or 482.313, or any assessment provided for in NRS 585.497, at the rate of 0.25 percent per month from the last day of the calendar month following the period for which the overpayment was made.

2. No refund or credit may be made of any interest imposed on the person making the overpayment with respect to the amount being refunded or credited.

3. The interest must be paid:

(a) In the case of a refund, to the last day of the calendar month following the date upon which the person making the overpayment, if the person has not already filed a claim, is notified by the Department that a claim may be filed or the date upon which the claim is certified to the State Board of Examiners, whichever is earlier.

(b) In the case of a credit, to the same date as that to which interest is computed on the tax or the amount against which the credit is applied.

Sec. 47. NRS 360.300 is hereby amended to read as follows:

360.300  1. If a person fails to file a return or the Department is not satisfied with the return or returns of any tax, contribution or premium or amount of tax, contribution or premium required to be paid to the State by any person, in accordance with the applicable provisions of this chapter, chapter 360B, 362, 363A, 363B, 369, 370, 372, 372A, 374, 377, 377A or 444A of NRS, *sections 3 to 45, inclusive, of this act,* NRS 482.313, or chapter 585 or 680B of NRS as administered or audited by the Department, it may compute and determine the amount required to be paid upon the basis of:

(a) The facts contained in the return;

(b) Any information within its possession or that may come into its possession; or

(c) Reasonable estimates of the amount.

2. One or more deficiency determinations may be made with respect to the amount due for one or for more than one period.

3. In making its determination of the amount required to be paid, the Department shall impose interest on the amount of tax determined to be due, calculated at the rate and in the manner set forth in NRS 360.417, unless a different rate of interest is specifically provided by statute.

4. The Department shall impose a penalty of 10 percent in addition to the amount of a determination that is made in the case of the failure of a person to file a return with the Department.

5. When a business is discontinued, a determination may be made at any time thereafter within the time prescribed in NRS 360.355 as to liability arising out of that business, irrespective of whether the determination is issued before the due date of the liability.

Sec. 48. NRS 360.417 is hereby amended to read as follows:

360.417  Except as otherwise provided in NRS 360.232 and 360.320, and unless a different penalty or rate of interest is specifically provided by statute, any person who fails to pay any tax provided for in chapter 362, 363A, 363B, 369, 370, 372, 374, 377, 377A, 444A or 585 of NRS, *or sections 3 to 45, inclusive, of this act,* or any fee provided for in NRS 482.313, and any person or governmental entity that fails to pay any fee provided for in NRS 360.787, to the State or a county within the time required, shall pay a penalty of not more than 10 percent of the amount of the tax or fee which is owed, as determined by the Department, in addition to the tax or fee, plus interest at the rate of 0.75 percent per month, or fraction of a month, from the last day of the month following the period for which the amount or any portion of the amount should have been reported until the date of payment. The amount of any penalty imposed must be based on a graduated schedule adopted by the Nevada Tax Commission which takes into consideration the length of time the tax or fee remained unpaid.

Sec. 49. NRS 360.510 is hereby amended to read as follows:

360.510  1. If any person is delinquent in the payment of any tax or fee administered by the Department or if a determination has been made against the person which remains unpaid, the Department may:

(a) Not later than 3 years after the payment became delinquent or the determination became final; or

(b) Not later than 6 years after the last recording of an abstract of judgment or of a certificate constituting a lien for tax owed,

➡give a notice of the delinquency and a demand to transmit personally or by registered or certified mail to any person, including, without limitation, any officer or department of this State or any political subdivision or agency of this State, who has in his or her possession or under his or her control any credits or other personal property belonging to the delinquent, or owing any debts to the delinquent or person against whom a determination has been made which remains unpaid, or owing any debts to the delinquent or that person. In the case of any state officer, department or agency, the notice must be given to the

officer, department or agency before the Department presents the claim of the delinquent taxpayer to the State Controller.

2. A state officer, department or agency which receives such a notice may satisfy any debt owed to it by that person before it honors the notice of the Department.

3. After receiving the demand to transmit, the person notified by the demand may not transfer or otherwise dispose of the credits, other personal property, or debts in his or her possession or under his or her control at the time the person received the notice until the Department consents to a transfer or other disposition.

4. Every person notified by a demand to transmit shall, within 10 days after receipt of the demand to transmit, inform the Department of and transmit to the Department all such credits, other personal property or debts in his or her possession, under his or her control or owing by that person within the time and in the manner requested by the Department. Except as otherwise provided in subsection 5, no further notice is required to be served to that person.

5. If the property of the delinquent taxpayer consists of a series of payments owed to him or her, the person who owes or controls the payments shall transmit the payments to the Department until otherwise notified by the Department. If the debt of the delinquent taxpayer is not paid within 1 year after the Department issued the original demand to transmit, the Department shall issue another demand to transmit to the person responsible for making the payments informing him or her to continue to transmit payments to the Department or that his or her duty to transmit the payments to the Department has ceased.

6. If the notice of the delinquency seeks to prevent the transfer or other disposition of a deposit in a bank or credit union or other credits or personal property in the possession or under the control of a bank, credit union or other depository institution, the notice must be delivered or mailed to any branch or office of the bank, credit union or other depository institution at which the deposit is carried or at which the credits or personal property is held.

7. If any person notified by the notice of the delinquency makes any transfer or other disposition of the property or debts required to be withheld or transmitted, to the extent of the value of the property or the amount of the debts thus transferred or paid, that person is liable to the State for any indebtedness due pursuant to this chapter, or chapter 360B, 362, 363A, 363B, 369, 370, 372, 372A, 374, 377, 377A or 444A of NRS, *sections 3 to 45, inclusive, of this act,* NRS 482,313, or chapter 585 or 680B of NRS from the person with respect to whose obligation the notice was given if solely by reason of the transfer or other disposition the State is unable to recover the indebtedness of the person with respect to whose obligation the notice was given.

Sec. 50. NRS 363A.130 is hereby amended to read as follows:

363A.130   1.   There is hereby imposed an excise tax on each employer at the rate of [2] *2.29* percent of the wages, as defined in NRS 612.190, paid by the employer during a calendar quarter with respect to employment in connection with the business activities of the employer.

2.   The tax imposed by this section:

(a) Does not apply to any person or other entity or any wages this State is prohibited from taxing under the Constitution, laws or treaties of the United States or the Nevada Constitution.

(b) Must not be deducted, in whole or in part, from any wages of persons in the employment of the employer.

3.   Each employer shall, on or before the last day of the month immediately following each calendar quarter for which the employer is required to pay a contribution pursuant to NRS 612.535:

(a) File with the Department a return on a form prescribed by the Department; and

(b) Remit to the Department any tax due pursuant to this section for that calendar quarter.

Sec. 51. NRS 363A.130 is hereby amended to read as follows:

363A.130   1.   There is hereby imposed an excise tax on each employer at the rate of [2.29] *2.42* percent of the wages, as defined in NRS 612.190, paid by the employer during a calendar quarter with respect to employment in connection with the business activities of the employer.

2.   The tax imposed by this section:

(a) Does not apply to any person or other entity or any wages this State is prohibited from taxing under the Constitution, laws or treaties of the United States or the Nevada Constitution.

(b) Must not be deducted, in whole or in part, from any wages of persons in the employment of the employer.

3.   Each employer shall, on or before the last day of the month immediately following each calendar quarter for which the employer is required to pay a contribution pursuant to NRS 612.535:

(a) File with the Department a return on a form prescribed by the Department; and

(b) Remit to the Department any tax due pursuant to this section for that calendar quarter.

Sec. 52. NRS 363A.130 is hereby amended to read as follows:

363A.130   1.   There is hereby imposed an excise tax on each employer at the rate of [2.42] *2* percent of the wages, as defined in NRS 612.190, paid by the employer during a calendar quarter with respect to employment in connection with the business activities of the employer.

2.   The tax imposed by this section:

(a) Does not apply to any person or other entity or any wages this State is prohibited from taxing under the Constitution, laws or treaties of the United States or the Nevada Constitution.

(b) Must not be deducted, in whole or in part, from any wages of persons in the employment of the

employer.

3. Each employer shall, on or before the last day of the month immediately following each calendar quarter for which the employer is required to pay a contribution pursuant to NRS 612.535:

(a) File with the Department a return on a form prescribed by the Department; and

(b) Remit to the Department any tax due pursuant to this section for that calendar quarter.

Sec. 53. NRS 78.245 is hereby amended to read as follows:

78.245 [No]

*1. Except as otherwise provided in subsection 2, no* stocks, bonds or other securities issued by any corporation organized under this chapter, nor the income or profits therefrom, nor the transfer thereof by assignment, descent, testamentary disposition or otherwise, shall be taxed by this State when such stocks, bonds or other securities shall be owned by nonresidents of this State or by foreign corporations.

*2. The provisions of subsection 1 do not apply to the tax imposed pursuant to sections 3 to 45, inclusive, of this act.*

Sec. 54. NRS 90.420 is hereby amended to read as follows:

90.420  1.  The Administrator by order may deny, suspend or revoke any license, fine any licensed person, limit the activities governed by this chapter that an applicant or licensed person may perform in this State, bar an applicant or licensed person from association with a licensed broker-dealer or investment adviser or bar from employment with a licensed broker-dealer or investment adviser a person who is a partner, officer, director, sales representative, investment adviser or representative of an investment adviser, or a person occupying a similar status or performing a similar function for an applicant or licensed person, if the Administrator finds that the order is in the public interest and that the applicant or licensed person or, in the case of a broker-dealer or investment adviser, any partner, officer, director, sales representative, investment adviser, representative of an investment adviser, or person occupying a similar status or performing similar functions or any person directly or indirectly controlling the broker-dealer or investment adviser, or any transfer agent or any person directly or indirectly controlling the transfer agent:

(a) Has filed an application for licensing with the Administrator which, as of its effective date, or as of any date after filing in the case of an order denying effectiveness, was incomplete in a material respect or contained a statement that was, in light of the circumstances under which it was made, false or misleading with respect to a material fact;

(b) Has violated or failed to comply with a provision of this chapter as now or formerly in effect or a regulation or order adopted or issued under this chapter;

(c) Is the subject of an adjudication or determination after notice and opportunity for hearing, within the last 5 years by a securities agency or administrator of another state or a court of competent jurisdiction that the person has violated the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act or the securities law of any other state, but only if the acts constituting the violation of that state's law would constitute a violation of this chapter had the acts taken place in this State;

(d) Within the last 10 years has been convicted of a felony or misdemeanor which the Administrator finds:

(1) Involves the purchase or sale of a security, taking a false oath, making a false report, bribery, perjury, burglary, robbery or conspiracy to commit any of the foregoing offenses;

(2) Arises out of the conduct of business as a broker-dealer, investment adviser, depository institution, insurance company or fiduciary; or

(3) Involves the larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion or misappropriation of money or securities or conspiracy to commit any of the foregoing offenses;

(e) Is or has been permanently or temporarily enjoined by any court of competent jurisdiction, unless the order has been vacated, from acting as an investment adviser, representative of an investment adviser, underwriter, broker-dealer or as an affiliated person or employee of an investment company, depository institution or insurance company or from engaging in or continuing any conduct or practice in connection with any of the foregoing activities or in connection with the purchase or sale of a security;

(f) Is or has been the subject of an order of the Administrator, unless the order has been vacated, denying, suspending or revoking the person's license as a broker-dealer, sales representative, investment adviser, representative of an investment adviser or transfer agent;

(g) Is or has been the subject of any of the following orders which were issued within the last 5 years, unless the order has been vacated:

(1) An order by the securities agency or administrator of another state, Canadian province or territory or by the Securities and Exchange Commission or a comparable regulatory agency of another country, entered after notice and opportunity for hearing, denying, suspending or revoking the person's license as a broker-dealer, sales representative, investment adviser, representative of an investment adviser or transfer agent;

(2) A suspension or expulsion from membership in or association with a member of a self-regulatory organization;

(3) An order of the United States Postal Service relating to fraud;

(4) An order to cease and desist entered after notice and opportunity for hearing by the Administrator, the securities agency or administrator of another state, Canadian province or territory, the Securities and Exchange Commission or a comparable regulatory agency of another country, or the

Commodity Futures Trading Commission; or

(5) An order by the Commodity Futures Trading Commission denying, suspending or revoking registration under the Commodity Exchange Act;

(h) Has engaged in unethical or dishonest practices in the securities business;

(i) Is insolvent, either in the sense that liabilities exceed assets or in the sense that obligations cannot be met as they mature, but the Administrator may not enter an order against a broker-dealer or investment adviser under this paragraph without a finding of insolvency as to the broker-dealer or investment adviser;

(j) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act;*

(k) Is determined by the Administrator in compliance with NRS 90.430 not to be qualified on the basis of lack of training, experience and knowledge of the securities business; or

(l) Has failed reasonably to supervise a sales representative, employee or representative of an investment adviser.

2. The Administrator may not institute a proceeding on the basis of a fact or transaction known to the director when the license became effective unless the proceeding is instituted within 90 days after issuance of the license.

3. If the Administrator finds that an applicant or licensed person is no longer in existence or has ceased to do business as a broker-dealer, sales representative, investment adviser, representative of an investment adviser or transfer agent or is adjudicated mentally incompetent or subjected to the control of a committee, conservator or guardian or cannot be located after reasonable search, the Administrator may by order deny the application or revoke the license.

Sec. 55. NRS 90.730 is hereby amended to read as follows:

90.730  1. Except as otherwise provided in subsection 2, information and records filed with or obtained by the Administrator are public information and are available for public examination.

2. Except as otherwise provided in subsections 3 and 4 and NRS 239.0115, the following information and records do not constitute public information under subsection 1 and are confidential:

(a) Information or records obtained by the Administrator in connection with an investigation concerning possible violations of this chapter: and

(b) Information or records filed with the Administrator in connection with a registration statement filed under this chapter or a report under NRS 90.390 which constitute trade secrets or commercial or financial information of a person for which that person is entitled to and has asserted a claim of privilege or confidentiality authorized by law.

3. The Administrator may submit any information or evidence obtained in connection with an investigation to the:

(a) Attorney General or appropriate district attorney for the purpose of prosecuting a criminal action under this chapter; and

(b) Department of Taxation for its use in carrying out the provisions of chapter 363A of NRS [;] *and sections 3 to 45, inclusive, of this act.*

4. The Administrator may disclose any information obtained in connection with an investigation pursuant to NRS 90.620 to the agencies and administrators specified in subsection 1 of NRS 90.740 but only if disclosure is provided for the purpose of a civil, administrative or criminal investigation or proceeding, and the receiving agency or administrator represents in writing that under applicable law protections exist to preserve the integrity, confidentiality and security of the information.

5. This chapter does not create any privilege or diminish any privilege existing at common law, by statute, regulation or otherwise.

Sec. 56. NRS 604A.820 is hereby amended to read as follows:

604A.820  1. If the Commissioner has reason to believe that grounds for revocation or suspension of a license exist, the Commissioner shall give 20 days' written notice to the licensee stating the contemplated action and, in general, the grounds therefor and set a date for a hearing.

2. At the conclusion of a hearing, the Commissioner shall:

(a) Enter a written order either dismissing the charges, revoking the license or suspending the license for a period of not more than 60 days, which period must include any prior temporary suspension. The Commissioner shall send a copy of the order to the licensee by registered or certified mail.

(b) Impose upon the licensee an administrative fine of not more than $10,000 for each violation by the licensee of any provision of this chapter or any regulation adopted pursuant thereto.

(c) If a fine is imposed pursuant to this section, enter such order as is necessary to recover the costs of the proceeding, including investigative costs and attorney's fees of the Commissioner.

3. The grounds for revocation or suspension of a license are that:

(a) The licensee has failed to pay the annual license fee;

(b) The licensee, either knowingly or without any exercise of due care to prevent it, has violated any provision of this chapter or any lawful regulation adopted pursuant thereto;

(c) The licensee has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act;*

(d) Any fact or condition exists which would have justified the Commissioner in denying the licensee's original application for a license pursuant to the provisions of this chapter; or

(e) The licensee:

(1) Failed to open an office for the conduct of the business authorized by his or her license within 180 days after the date the license was issued; or

(2) Has failed to remain open for the conduct of the business for a period of 180 days without good cause therefor.

4. Any revocation or suspension applies only to the license granted to a person for the particular office for which grounds for revocation or suspension exist.

5. An order suspending or revoking a license becomes effective 5 days after being entered unless the order specifies otherwise or a stay is granted.

**Sec. 57.** NRS 612.265 is hereby amended to read as follows:

612.265 1. Except as otherwise provided in this section and NRS 239.0115, information obtained from any employing unit or person pursuant to the administration of this chapter and any determination as to the benefit rights of any person is confidential and may not be disclosed or be open to public inspection in any manner which would reveal the person's or employing unit's identity.

2. Any claimant or a legal representative of a claimant is entitled to information from the records of the Division, to the extent necessary for the proper presentation of the claimant's claim in any proceeding pursuant to this chapter. A claimant or an employing unit is not entitled to information from the records of the Division for any other purpose.

3. Subject to such restrictions as the Administrator may by regulation prescribe, the information obtained by the Division may be made available to:

(a) Any agency of this or any other state or any federal agency charged with the administration or enforcement of laws relating to unemployment compensation, public assistance, workers' compensation or labor and industrial relations, or the maintenance of a system of public employment offices;

(b) Any state or local agency for the enforcement of child support;

(c) The Internal Revenue Service of the Department of the Treasury;

(d) The Department of Taxation; and

(e) The State Contractors' Board in the performance of its duties to enforce the provisions of chapter 624 of NRS.
➡Information obtained in connection with the administration of the Employment Service may be made available to persons or agencies for purposes appropriate to the operation of a public employment service or a public assistance program.

4. Upon written request made by a public officer of a local government, the Administrator shall furnish from the records of the Division the name, address and place of employment of any person listed in the records of employment of the Division. The request must set forth the social security number of the person about whom the request is made and contain a statement signed by proper authority of the local government certifying that the request is made to allow the proper authority to enforce a law to recover a debt or obligation owed to the local government. Except as otherwise provided in NRS 239.0115, the information obtained by the local government is confidential and may not be used or disclosed for any purpose other than the collection of a debt or obligation owed to that local government. The Administrator may charge a reasonable fee for the cost of providing the requested information.

5. The Administrator may publish or otherwise provide information on the names of employers, their addresses, their type or class of business or industry, and the approximate number of employees employed by each such employer, if the information released will assist unemployed persons to obtain employment or will be generally useful in developing and diversifying the economic interests of this State. Upon request by a state agency which is able to demonstrate that its intended use of the information will benefit the residents of this State, the Administrator may, in addition to the information listed in this subsection, disclose the number of employees employed by each employer and the total wages paid by each employer. The Administrator may charge a fee to cover the actual costs of any administrative expenses relating to the disclosure of this information to a state agency. The Administrator may require the state agency to certify in writing that the agency will take all actions necessary to maintain the confidentiality of the information and prevent its unauthorized disclosure.

6. Upon request therefor, the Administrator shall furnish to any agency of the United States charged with the administration of public works or assistance through public employment, and may furnish to any state agency similarly charged, the name, address, ordinary occupation and employment status of each recipient of benefits and the recipient's rights to further benefits pursuant to this chapter.

7. To further a current criminal investigation, the chief executive officer of any law enforcement agency of this State may submit a written request to the Administrator that the Administrator furnish, from the records of the Division, the name, address and place of employment of any person listed in the records of employment of the Division. The request must set forth the social security number of the person about whom the request is made and contain a statement signed by the chief executive officer certifying that the request is made to further a criminal investigation currently being conducted by the agency. Upon receipt of such a request, the Administrator shall furnish the information requested. The Administrator may charge a fee to cover the actual costs of any related administrative expenses.

8. In addition to the provisions of subsection 5, the Administrator shall provide lists containing the names and addresses of employers, and information regarding the wages paid by each employer to the Department of Taxation, upon request, for use in verifying returns for the taxes imposed pursuant to chapters 363A and 363B of NRS [.] _and sections 3 to 45, inclusive, of this act._ The Administrator may charge a fee to cover the actual costs of any related administrative expenses.

9. A private carrier that provides industrial insurance in this State shall submit to the Administrator

a list containing the name of each person who received benefits pursuant to chapters 616A to 616D, inclusive, or chapter 617 of NRS during the preceding month and request that the Administrator compare the information so provided with the records of the Division regarding persons claiming benefits pursuant to chapter 612 of NRS for the same period. The information submitted by the private carrier must be in a form determined by the Administrator and must contain the social security number of each such person. Upon receipt of the request, the Administrator shall make such a comparison and, if it appears from the information submitted that a person is simultaneously claiming benefits under chapter 612 of NRS and under chapters 616A to 616D, inclusive, or chapter 617 of NRS, the Administrator shall notify the Attorney General or any other appropriate law enforcement agency. The Administrator shall charge a fee to cover the actual costs of any related administrative expenses.

10. The Administrator may request the Comptroller of the Currency of the United States to cause an examination of the correctness of any return or report of any national banking association rendered pursuant to the provisions of this chapter, and may in connection with the request transmit any such report or return to the Comptroller of the Currency of the United States as provided in section 3305(c) of the Internal Revenue Code of 1954.

11. If any employee or member of the Board of Review, the Administrator or any employee of the Administrator, in violation of the provisions of this section, discloses information obtained from any employing unit or person in the administration of this chapter, or if any person who has obtained a list of applicants for work, or of claimants or recipients of benefits pursuant to this chapter uses or permits the use of the list for any political purpose, he or she is guilty of a gross misdemeanor.

12. All letters, reports or communications of any kind, oral or written, from the employer or employee to each other or to the Division or any of its agents, representatives or employees are privileged and must not be the subject matter or basis for any lawsuit if the letter, report or communication is written, sent, delivered or prepared pursuant to the requirements of this chapter.

Sec. 58. NRS 616B.012 is hereby amended to read as follows:

616B.012    1. Except as otherwise provided in this section and NRS 239.0115, 616B.015, 616B.021 and 616C.205, information obtained from any insurer, employer or employee is confidential and may not be disclosed or be open to public inspection in any manner which would reveal the person's identity.

2. Any claimant or legal representative of the claimant is entitled to information from the records of the insurer, to the extent necessary for the proper presentation of a claim in any proceeding under chapters 616A to 616D, inclusive, or chapter 617 of NRS.

3. The Division and Administrator are entitled to information from the records of the insurer which is necessary for the performance of their duties. The Administrator may, by regulation, prescribe the manner in which otherwise confidential information may be made available to:

(a) Any agency of this or any other state charged with the administration or enforcement of laws relating to industrial insurance, unemployment compensation, public assistance or labor law and industrial relations;

(b) Any state or local agency for the enforcement of child support;

(c) The Internal Revenue Service of the Department of the Treasury;

(d) The Department of Taxation; and

(e) The State Contractors' Board in the performance of its duties to enforce the provisions of chapter 624 of NRS.

➡Information obtained in connection with the administration of a program of industrial insurance may be made available to persons or agencies for purposes appropriate to the operation of a program of industrial insurance.

4. Upon written request made by a public officer of a local government, an insurer shall furnish from its records the name, address and place of employment of any person listed in its records. The request must set forth the social security number of the person about whom the request is made and contain a statement signed by proper authority of the local government certifying that the request is made to allow the proper authority to enforce a law to recover a debt or obligation owed to the local government. Except as otherwise provided in NRS 239.0115, the information obtained by the local government is confidential and may not be used or disclosed for any purpose other than the collection of a debt or obligation owed to the local government. The insurer may charge a reasonable fee for the cost of providing the requested information.

5. To further a current criminal investigation, the chief executive officer of any law enforcement agency of this State may submit to the Administrator a written request for the name, address and place of employment of any person listed in the records of an insurer. The request must set forth the social security number of the person about whom the request is made and contain a statement signed by the chief executive officer certifying that the request is made to further a criminal investigation currently being conducted by the agency. Upon receipt of a request, the Administrator shall instruct the insurer to furnish the information requested. Upon receipt of such an instruction, the insurer shall furnish the information requested. The insurer may charge a reasonable fee to cover any related administrative expenses.

6. Upon request by the Department of Taxation, the Administrator shall provide:

(a) Lists containing the names and addresses of employers; and

(b) Other information concerning employers collected and maintained by the Administrator or the Division to carry out the purposes of chapters 616A to 616D, inclusive, or chapter 617 of NRS,

➡to the Department for its use in verifying returns for the taxes imposed pursuant to chapters 363A and

68

363B of NRS [;] *and sections 3 to 45, inclusive, of this act.* The Administrator may charge a reasonable fee to cover any related administrative expenses.

7. Any person who, in violation of this section, discloses information obtained from files of claimants or policyholders or obtains a list of claimants or policyholders under chapters 616A to 616D, inclusive, or chapter 617 of NRS and uses or permits the use of the list for any political purposes, is guilty of a gross misdemeanor.

8. All letters, reports or communications of any kind, oral or written, from the insurer, or any of its agents, representatives or employees are privileged and must not be the subject matter or basis for any lawsuit if the letter, report or communication is written, sent, delivered or prepared pursuant to the requirements of chapters 616A to 616D, inclusive, or chapter 617 of NRS.

9. The provisions of this section do not prohibit the Administrator or the Division from disclosing any nonproprietary information relating to an uninsured employer or proof of industrial insurance.

**Sec. 59.** NRS 645B.060 is hereby amended to read as follows:

645B.060 1. Subject to the administrative control of the Director of the Department of Business and Industry, the Commissioner shall exercise general supervision and control over mortgage brokers and mortgage agents doing business in this State.

2. In addition to the other duties imposed upon him or her by law, the Commissioner shall:

(a) Adopt regulations:

(1) Setting forth the requirements for an investor to acquire ownership of or a beneficial interest in a loan secured by a lien on real property. The regulations must include, without limitation, the minimum financial conditions that the investor must comply with before becoming an investor.

(2) Establishing reasonable limitations and guidelines on loans made by a mortgage broker to a director, officer, mortgage agent or employee of the mortgage broker.

(b) Adopt any other regulations that are necessary to carry out the provisions of this chapter, except as to loan brokerage fees.

(c) Conduct such investigations as may be necessary to determine whether any person has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner.

(d) Except as otherwise provided in subsection 4, conduct an annual examination of each mortgage broker doing business in this State. The annual examination must include, without limitation, a formal exit review with the mortgage broker. The Commissioner shall adopt regulations prescribing:

(1) Standards for determining the rating of each mortgage broker based upon the results of the annual examination; and

(2) Procedures for resolving any objections made by the mortgage broker to the results of the annual examination. The results of the annual examination may not be opened to public inspection pursuant to NRS 645B.090 until after a period of time set by the Commissioner to determine any objections made by the mortgage broker.

(e) Conduct such other examinations, periodic or special audits, investigations and hearings as may be necessary for the efficient administration of the laws of this State regarding mortgage brokers and mortgage agents. The Commissioner shall adopt regulations specifying the general guidelines that will be followed when a periodic or special audit of a mortgage broker is conducted pursuant to this chapter.

(f) Classify as confidential certain records and information obtained by the Division when those matters are obtained from a governmental agency upon the express condition that they remain confidential. This paragraph does not limit examination by:

(1) The Legislative Auditor; or

(2) The Department of Taxation if necessary to carry out the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act.*

(g) Conduct such examinations and investigations as are necessary to ensure that mortgage brokers and mortgage agents meet the requirements of this chapter for obtaining a license, both at the time of the application for a license and thereafter on a continuing basis.

3. For each special audit, investigation or examination, a mortgage broker or mortgage agent shall pay a fee based on the rate established pursuant to NRS 645F.280.

4. The Commissioner may conduct examinations of a mortgage broker, as described in paragraph (d) of subsection 2, on a biennial instead of an annual basis if the mortgage broker:

(a) Received a rating in the last annual examination that meets a threshold determined by the Commissioner;

(b) Has not had any adverse change in financial condition since the last annual examination, as shown by financial statements of the mortgage broker;

(c) Has not had any complaints received by the Division that resulted in any administrative action by the Division; and

(d) Does not maintain any trust accounts pursuant to NRS 645B.170 or 645B.175 or arrange loans funded by private investors.

**Sec. 60.** NRS 645B.670 is hereby amended to read as follows:

645B.670 Except as otherwise provided in NRS 645B.690:

1. For each violation committed by an applicant for a license issued pursuant to this chapter, whether or not the applicant is issued a license, the Commissioner may impose upon the applicant an administrative fine of not more than $25,000 if the applicant:

(a) Has knowingly made or caused to be made to the Commissioner any false representation of material fact;

(b) Has suppressed or withheld from the Commissioner any information which the applicant possesses and which, if submitted by the applicant, would have rendered the applicant ineligible to be licensed pursuant to the provisions of this chapter; or

(c) Has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner in completing and filing his or her application for a license or during the course of the investigation of his or her application for a license.

2. For each violation committed by a mortgage broker, the Commissioner may impose upon the mortgage broker an administrative fine of not more than $25,000, may suspend, revoke or place conditions upon the mortgage broker's license, or may do both, if the mortgage broker, whether or not acting as such:

(a) Is insolvent;

(b) Is grossly negligent or incompetent in performing any act for which the mortgage broker is required to be licensed pursuant to the provisions of this chapter;

(c) Does not conduct his or her business in accordance with law or has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner;

(d) Is in such financial condition that the mortgage broker cannot continue in business with safety to his or her customers;

(e) Has made a material misrepresentation in connection with any transaction governed by this chapter;

(f) Has suppressed or withheld from a client any material facts, data or other information relating to any transaction governed by the provisions of this chapter which the mortgage broker knew or, by the exercise of reasonable diligence, should have known;

(g) Has knowingly made or caused to be made to the Commissioner any false representation of material fact or has suppressed or withheld from the Commissioner any information which the mortgage broker possesses and which, if submitted by the mortgage broker, would have rendered the mortgage broker ineligible to be licensed pursuant to the provisions of this chapter;

(h) Has failed to account to persons interested for all money received for a trust account;

(i) Has refused to permit an examination by the Commissioner of his or her books and affairs or has refused or failed, within a reasonable time, to furnish any information or make any report that may be required by the Commissioner pursuant to the provisions of this chapter or a regulation adopted pursuant to this chapter;

(j) Has been convicted of, or entered or agreed to enter a plea of guilty or nolo contendere to, a felony in a domestic, foreign or military court within the 7 years immediately preceding the date of the application, or at any time if such felony involved an act of fraud, dishonesty or a breach of trust, moral turpitude or money laundering.

(k) Has refused or failed to pay, within a reasonable time, any fees, assessments, costs or expenses that the mortgage broker is required to pay pursuant to this chapter or a regulation adopted pursuant to this chapter;

(l) Has failed to satisfy a claim made by a client which has been reduced to judgment;

(m) Has failed to account for or to remit any money of a client within a reasonable time after a request for an accounting or remittal;

(n) Has commingled the money or other property of a client with his or her own or has converted the money or property of others to his or her own use;

(o) Has engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice;

(p) Has repeatedly violated the policies and procedures of the mortgage broker;

(q) Has failed to exercise reasonable supervision over the activities of a mortgage agent as required by NRS 645B.460;

(r) Has instructed a mortgage agent to commit an act that would be cause for the revocation of the license of the mortgage broker, whether or not the mortgage agent commits the act;

(s) Has employed a person as a mortgage agent or authorized a person to be associated with the mortgage broker as a mortgage agent at a time when the mortgage broker knew or, in light of all the surrounding facts and circumstances, reasonably should have known that the person:

(1) Had been convicted of, or entered or agreed to enter a plea of guilty or nolo contendere to, a felony in a domestic, foreign or military court within the 7 years immediately preceding the date of application, or at any time if such felony involved an act of fraud, dishonesty or a breach of trust, moral turpitude or money laundering; or

(2) Had a license or registration as a mortgage agent, mortgage banker, mortgage broker or residential mortgage loan originator revoked in this State or any other jurisdiction or had a financial services license or registration revoked within the immediately preceding 10 years;

(t) Has violated NRS 645C.557; or

(u) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] _or sections 3 to 45, inclusive, of this act._

3. For each violation committed by a mortgage agent, the Commissioner may impose upon the mortgage agent an administrative fine of not more than $25,000, may suspend, revoke or place conditions upon the mortgage agent's license, or may do both, if the mortgage agent, whether or not acting as such:

(a) Is grossly negligent or incompetent in performing any act for which the mortgage agent is required to be licensed pursuant to the provisions of this chapter;

(b) Has made a material misrepresentation in connection with any transaction governed by this chapter;

(c) Has suppressed or withheld from a client any material facts, data or other information relating to any transaction governed by the provisions of this chapter which the mortgage agent knew or, by the exercise of reasonable diligence, should have known;

(d) Has knowingly made or caused to be made to the Commissioner any false representation of material fact or has suppressed or withheld from the Commissioner any information which the mortgage agent possesses and which, if submitted by the mortgage agent, would have rendered the mortgage agent ineligible to be licensed pursuant to the provisions of this chapter;

(e) Has been convicted of, or entered or agreed to enter a plea of guilty or nolo contendere to, a felony in a domestic, foreign or military court within the 7 years immediately preceding the date of the application, or at any time if such felony involved an act of fraud, dishonesty or a breach of trust, moral turpitude or money laundering.

(f) Has failed to account for or to remit any money of a client within a reasonable time after a request for an accounting or remittal;

(g) Has commingled the money or other property of a client with his or her own or has converted the money or property of others to his or her own use;

(h) Has engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice;

(i) Has violated NRS 645C.557;

(j) Has repeatedly violated the policies and procedures of the mortgage broker with whom the mortgage agent is associated or by whom he or she is employed; or

(k) Has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner or has assisted or offered to assist another person to commit such a violation.

**Sec. 61.** NRS 645E.300 is hereby amended to read as follows:

645E.300  1.  Subject to the administrative control of the Director of the Department of Business and Industry, the Commissioner shall exercise general supervision and control over mortgage bankers doing business in this State.

2.  In addition to the other duties imposed upon him or her by law, the Commissioner shall:

(a) Adopt regulations establishing reasonable limitations and guidelines on loans made by a mortgage banker to a director, officer or employee of the mortgage banker.

(b) Adopt any other regulations that are necessary to carry out the provisions of this chapter, except as to loan fees.

(c) Conduct such investigations as may be necessary to determine whether any person has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner.

(d) Except as otherwise provided in subsection 4, conduct an annual examination of each mortgage banker doing business in this State.

(e) Conduct such other examinations, periodic or special audits, investigations and hearings as may be necessary for the efficient administration of the laws of this State regarding mortgage bankers.

(f) Classify as confidential certain records and information obtained by the Division when those matters are obtained from a governmental agency upon the express condition that they remain confidential. This paragraph does not limit examination by:

(1) The Legislative Auditor; or

(2) The Department of Taxation if necessary to carry out the provisions of chapter 363A of NRS [.] *or sections 3 to 45, inclusive, of this act.*

(g) Conduct such examinations and investigations as are necessary to ensure that mortgage bankers meet the requirements of this chapter for obtaining a license, both at the time of the application for a license and thereafter on a continuing basis.

3.  For each special audit, investigation or examination, a mortgage banker shall pay a fee based on the rate established pursuant to NRS 645F.280.

4.  The Commissioner may conduct biennial examinations of a mortgage banker instead of annual examinations, as described in paragraph (d) of subsection 2, if the mortgage banker:

(a) Received a rating in the last annual examination that meets a threshold determined by the Commissioner;

(b) Has not had any adverse change in financial condition since the last annual examination, as shown by financial statements of the mortgage banker; and

(c) Has not had any complaints received by the Division that resulted in any administrative action by the Division.

**Sec. 62.** NRS 645E.670 is hereby amended to read as follows:

645E.670  1.  For each violation committed by an applicant, whether or not the applicant is issued a license, the Commissioner may impose upon the applicant an administrative fine of not more than $25,000 if the applicant:

(a) Has knowingly made or caused to be made to the Commissioner any false representation of material fact;

(b) Has suppressed or withheld from the Commissioner any information which the applicant possesses and which, if submitted by the applicant, would have rendered the applicant ineligible to be

licensed pursuant to the provisions of this chapter; or

    (c) Has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner in completing and filing his or her application for a license or during the course of the investigation of his or her application for a license.

    2. For each violation committed by a licensee, the Commissioner may impose upon the licensee an administrative fine of not more than $25,000, may suspend, revoke or place conditions upon the license, or may do both, if the licensee, whether or not acting as such:

    (a) Is insolvent;

    (b) Is grossly negligent or incompetent in performing any act for which the licensee is required to be licensed pursuant to the provisions of this chapter;

    (c) Does not conduct his or her business in accordance with law or has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner;

    (d) Is in such financial condition that the licensee cannot continue in business with safety to his or her customers;

    (e) Has made a material misrepresentation in connection with any transaction governed by this chapter;

    (f) Has suppressed or withheld from a client any material facts, data or other information relating to any transaction governed by the provisions of this chapter which the licensee knew or, by the exercise of reasonable diligence, should have known;

    (g) Has knowingly made or caused to be made to the Commissioner any false representation of material fact or has suppressed or withheld from the Commissioner any information which the licensee possesses and which, if submitted by the licensee, would have rendered the licensee ineligible to be licensed pursuant to the provisions of this chapter;

    (h) Has failed to account to persons interested for all money received for a trust account;

    (i) Has refused to permit an examination by the Commissioner of his or her books and affairs or has refused or failed, within a reasonable time, to furnish any information or make any report that may be required by the Commissioner pursuant to the provisions of this chapter or a regulation adopted pursuant to this chapter;

    (j) Has been convicted of, or entered or agreed to enter a plea of nolo contendere to, a felony in a domestic, foreign or military court within the 7 years immediately preceding the date of the application, or at any time if such felony involved an act of fraud, dishonesty or a breach of trust, moral turpitude or money laundering;

    (k) Has refused or failed to pay, within a reasonable time, any fees, assessments, costs or expenses that the licensee is required to pay pursuant to this chapter or a regulation adopted pursuant to this chapter;

    (l) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act;*

    (m) Has failed to satisfy a claim made by a client which has been reduced to judgment;

    (n) Has failed to account for or to remit any money of a client within a reasonable time after a request for an accounting or remittal;

    (o) Has violated NRS 645C.557;

    (p) Has commingled the money or other property of a client with his or her own or has converted the money or property of others to his or her own use; or

    (q) Has engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice.

    3. An order that imposes discipline and the findings of fact and conclusions of law supporting that order are public records.

    Sec. 63. NRS 658.151 is hereby amended to read as follows:

    658.151 1. The Commissioner may forthwith take possession of the business and property of any depository institution to which this title or title 56 of NRS applies when it appears that the depository institution:

    (a) Has violated its charter or any laws applicable thereto.

    (b) Is conducting its business in an unauthorized or unsafe manner.

    (c) Is in an unsafe or unsound condition to transact its business.

    (d) Has an impairment of its stockholders' or members' equity.

    (e) Has refused to pay its depositors in accordance with the terms on which such deposits were received, or has refused to pay its holders of certificates of indebtedness or investment in accordance with the terms upon which those certificates of indebtedness or investment were sold.

    (f) Has become or is in imminent danger of becoming otherwise insolvent.

    (g) Has neglected or refused to comply with the terms of a lawful order of the Commissioner.

    (h) Has refused, upon proper demand, to submit its records, affairs and concerns for inspection and examination of an appointed or authorized examiner of the Commissioner.

    (i) Has made a voluntary assignment of its assets to trustees.

    (j) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act.*

    2. The Commissioner also may forthwith take possession of the business and property of any depository institution to which this title or title 56 of NRS applies when it appears that the officers of the depository institution have refused to be examined upon oath regarding its affairs.

Sec. 64. NRS 665.133 is hereby amended to read as follows:

665.133  1.  The records and information described in NRS 665.130 may be disclosed to:

(a) An agency of the Federal Government or of another state which regulates the financial institution which is the subject of the records or information;

(b) The Director of the Department of Business and Industry for the Director's confidential use;

(c) The State Board of Finance for its confidential use, if the report or other information is necessary for the State Board of Finance to perform its duties under this title;

(d) The Department of Taxation for its use in carrying out the provisions of chapter 363A of NRS [;] *and sections 3 to 45, inclusive, of this act;*

(e) An entity which insures or guarantees deposits;

(f) A public officer authorized to investigate criminal charges in connection with the affairs of the depository institution;

(g) A person preparing a proposal for merging with or acquiring an institution or holding company, but only after notice of the disclosure has been given to the institution or holding company;

(h) Any person to whom the subject of the report has authorized the disclosure;

(i) Any other person if the Commissioner determines, after notice and opportunity for hearing, that disclosure is in the public interest and outweighs any potential harm to the depository institution and its stockholders, members, depositors and creditors; and

(j) Any court in a proceeding initiated by the Commissioner concerning the financial institution.

2.  All the reports made available pursuant to this section remain the property of the Division of Financial Institutions, and no person, agency or authority to whom the reports are made available, or any officer, director or employee thereof, may disclose any of the reports or any information contained therein, except in published statistical material that does not disclose the affairs of any natural person or corporation.

Sec. 65. NRS 669.275 is hereby amended to read as follows:

669.275  1.  The Commissioner may require a licensee to provide an audited financial statement prepared by an independent certified public accountant licensed to do business in this State.

2.  On the fourth Monday in January of each year, each licensee shall submit to the Commissioner a list of stockholders required to be maintained pursuant to paragraph (c) of subsection 1 of NRS 78.105 or the list of members required to be maintained pursuant to paragraph (a) of subsection 1 of NRS 86.241, verified by the president or a manager, as appropriate.

3.  The list of members required to be maintained pursuant to paragraph (a) of subsection 1 of NRS 86.241 must include the percentage of each member's interest in the company, in addition to the requirements set forth in that section.

4.  Except as otherwise provided in NRS 239.0115, any document submitted pursuant to this section is confidential. *This subsection does not limit the examination of any document by the Department of Taxation if necessary to carry out the provisions of sections 3 to 45, inclusive, of this act.*

Sec. 66. NRS 669.2825 is hereby amended to read as follows:

669.2825  1.  The Commissioner may institute disciplinary action or forthwith initiate proceedings to take possession of the business and property of any retail trust company when it appears that the retail trust company:

(a) Has violated its charter or any state or federal laws applicable to the business of a trust company.

(b) Is conducting its business in an unauthorized or unsafe manner.

(c) Is in an unsafe or unsound condition to transact its business.

(d) Has an impairment of its stockholders' equity.

(e) Has refused to pay or transfer account assets to its account holders as required by the terms of the accounts' governing instruments.

(f) Has become insolvent.

(g) Has neglected or refused to comply with the terms of a lawful order of the Commissioner.

(h) Has refused, upon proper demand, to submit its records, affairs and concerns for inspection and examination of an appointed or authorized examiner of the Commissioner.

(i) Has made a voluntary assignment of its assets to receivers, conservators, trustees or creditors without complying with NRS 669.230.

(j) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act.*

(k) Has materially and willfully breached its fiduciary duties to its customers.

(l) Has failed to properly disclose all fees, interest and other charges to its customers.

(m) Has willfully engaged in material conflicts of interest regarding a customer's account.

(n) Has made intentional material misrepresentations regarding any aspect of the services performed or proposed to be performed by the retail trust company.

2.  The Commissioner also may forthwith initiate proceedings to take possession of the business and property of any trust company when it appears that the officers of the trust company have refused to be examined upon oath regarding its affairs.

Sec. 67. NRS 669.2847 is hereby amended to read as follows:

669.2847  1.  If the Commissioner has reason to believe that grounds for revocation or suspension

of a license exist, the Commissioner shall give at least 20 days' written notice to the licensee stating the contemplated action and, in general, the grounds therefor and set a date for a hearing.

  2. At the conclusion of a hearing, the Commissioner shall:

  (a) Enter a written order dismissing the charges, revoking the license or suspending the license for a period of not more than 60 days, which period must include any prior temporary suspension. The Commissioner shall send a copy of the order to the licensee by registered or certified mail.

  (b) Impose upon the licensee an administrative fine of not more than $10,000 for each violation by the licensee of any provision of this chapter or any regulation adopted pursuant thereto.

  (c) If a fine is imposed pursuant to this section, enter such order as is necessary to recover the costs of the proceeding, including his or her investigative costs and attorney's fees.

  3. The grounds for revocation or suspension of a license are that:

  (a) The licensee has failed to pay the annual license fee;

  (b) The licensee, either knowingly or without any exercise of due care to prevent it, has violated any provision of this chapter or any regulation adopted pursuant thereto or any lawful order of the Division of Financial Institutions;

  (c) The licensee has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act;*

  (d) Any fact or condition exists which would have justified the Commissioner in denying the licensee's original application for a license pursuant to the provisions of this chapter; or

  (e) The licensee:

    (1) Failed to open an office for the conduct of the business authorized by his or her license within 180 days after the date the license was issued; or

    (2) Has failed to remain open for the conduct of the business for a period of 30 days without good cause therefor.

  4. An order suspending or revoking a license becomes effective 5 days after being entered unless the order specifies otherwise or a stay is granted.

  **Sec. 68.** NRS 669.285 is hereby amended to read as follows:

  669.285 Except as otherwise provided in NRS 239.0115, any application and personal or financial records submitted by a person pursuant to the provisions of this chapter and any personal or financial records or other documents obtained by the Division of Financial Institutions pursuant to an examination or audit conducted by the Division are confidential and may be disclosed only to:

  1. The Division, any authorized employee of the Division and any state or federal agency investigating the activities covered under the provisions of this chapter; [and]

  *2. The Department of Taxation for its use in carrying out the provisions of sections 3 to 45, inclusive, of this act; and*

  *3.* Any person when the Commissioner, in the Commissioner's discretion, determines that the interests of the public that would be protected by disclosure outweigh the interest of any person in the confidential information not being disclosed.

  **Sec. 69.** NRS 669A.310 is hereby amended to read as follows:

  669A.310 1. Except as otherwise provided in this section, any application and personal or financial records submitted by a person pursuant to the provisions of this chapter, any personal or financial records or other documents obtained by the Division of Financial Institutions pursuant to an examination or audit conducted by the Division pursuant to this chapter and any other private information relating to a family trust company are confidential and may be disclosed only to:

  (a) The Division, any authorized employee of the Division and a state or federal agency investigating activities regulated pursuant to this chapter;[and]

  (b) *The Department of Taxation for its use in carrying out the provisions of sections 3 to 45, inclusive, of this act; and*

  *(c)* Any other person if the Commissioner, in the Commissioner's discretion, determines that the interests of the public in disclosing the information outweigh the interests of the person about whom the information pertains in not disclosing the information.

  2. The Commissioner shall give to the family trust company to which the information relates 10-days' prior written notice of intent to disclose confidential information directly or indirectly to a person pursuant to paragraph [(b)] *(c)* of subsection 1. Any family trust company which receives such a notice may object to the disclosure of the confidential information and will be afforded the right to a hearing in accordance with the provisions of chapter 233B of NRS. If a family trust company requests a hearing, the Commissioner may not reveal confidential information prior to the conclusion of the hearing and a ruling. Prior to dissemination of any confidential information, the Commissioner shall require a written agreement not to reveal the confidential information by the party receiving the confidential information. In no event shall the Commissioner disclose confidential information to the general public, any competitor or any potential competitor of a family trust company.

  3. Nothing in this chapter is intended to preclude a law enforcement officer from gaining access to otherwise confidential records by subpoena, court order, search warrant or other lawful means. Notwithstanding any other provision of this chapter, the Commissioner shall have the ability to share information with other out of state or federal regulators with whom the Department of Business and Industry has an agreement regarding the sharing of information. Nothing in this chapter is intended to preclude any agency of this State from gaining access to otherwise confidential records in accordance with

74

any applicable law.

Sec. 70. NRS 673.484 is hereby amended to read as follows:
673.484 The Commissioner may after notice and hearing suspend or revoke the charter of any association for:
1. Repeated failure to abide by the provisions of this chapter or the regulations adopted thereunder.
2. Failure to pay a tax as required pursuant to the provisions of chapter 363A of NRS [.] *or sections 3 to 45, inclusive, of this act.*

Sec. 71. NRS 675.440 is hereby amended to read as follows:
675.440 1. If the Commissioner has reason to believe that grounds for revocation or suspension of a license exist, he or she shall give 20 days' written notice to the licensee stating the contemplated action and, in general, the grounds therefor and set a date for a hearing.
2. At the conclusion of a hearing, the Commissioner shall:
(a) Enter a written order either dismissing the charges, revoking the license, or suspending the license for a period of not more than 60 days, which period must include any prior temporary suspension. A copy of the order must be sent by registered or certified mail to the licensee.
(b) Impose upon the licensee an administrative fine of not more than $10,000 for each violation by the licensee of any provision of this chapter or any lawful regulation adopted under it.
(c) If a fine is imposed pursuant to this section, enter such order as is necessary to recover the costs of the proceeding, including his or her investigative costs and attorney's fees.
3. The grounds for revocation or suspension of a license are that:
(a) The licensee has failed to pay the annual license fee;
(b) The licensee, either knowingly or without any exercise of due care to prevent it, has violated any provision of this chapter or any lawful regulation adopted under it;
(c) The licensee has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [.] *or sections 3 to 45, inclusive, of this act;*
(d) Any fact or condition exists which would have justified the Commissioner in denying the licensee's original application for a license hereunder; or
(e) The applicant failed to open an office for the conduct of the business authorized under this chapter within 120 days after the date the license was issued, or has failed to remain open for the conduct of the business for a period of 120 days without good cause therefor.
4. Any revocation or suspension applies only to the license granted to a person for the particular office for which grounds for revocation or suspension exist.
5. An order suspending or revoking a license becomes effective 5 days after being entered unless the order specifies otherwise or a stay is granted.

Sec. 72. NRS 677.510 is hereby amended to read as follows:
677.510 1. If the Commissioner has reason to believe that grounds for revocation or suspension of a license exist, he or she shall give 20 days' written notice to the licensee stating the contemplated action and, in general, the grounds therefor and set a date for a hearing.
2. At the conclusion of a hearing, the Commissioner shall:
(a) Enter a written order either dismissing the charges, or revoking the license, or suspending the license for a period of not more than 60 days, which period must include any prior temporary suspension. A copy of the order must be sent by registered or certified mail to the licensee.
(b) Impose upon the licensee an administrative fine of not more than $10,000 for each violation by the licensee of any provision of this chapter or any lawful regulation adopted pursuant thereto.
(c) If a fine is imposed pursuant to this section, enter such order as is necessary to recover the costs of the proceeding, including his or her investigative costs and attorney's fees.
3. The grounds for revocation or suspension of a license are that:
(a) The licensee has failed to pay the annual license fee;
(b) The licensee, either knowingly or without any exercise of due care to prevent it, has violated any provision of this chapter or any lawful regulation adopted pursuant thereto;
(c) The licensee has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [.] *or sections 3 to 45, inclusive, of this act;*
(d) Any fact or condition exists which would have justified the Commissioner in denying the licensee's original application for a license hereunder; or
(e) The applicant failed to open an office for the conduct of the business authorized under this chapter within 120 days after the date the license was issued, or has failed to remain open for the conduct of the business for a period of 120 days without good cause therefor.
4. Any revocation or suspension applies only to the license granted to a person for the particular office for which grounds for revocation or suspension exist.
5. An order suspending or revoking a license becomes effective 5 days after being entered unless the order specifies otherwise or a stay is granted.

Sec. 73. NRS 680B.037 is hereby amended to read as follows:
680B.037 [Payment]
*1. Except as otherwise provided in subsection 2, payment* by an insurer of the tax imposed by NRS 680B.027 is in lieu of all taxes imposed by the State or any city, town or county upon premiums or

upon income of insurers and of franchise, privilege or other taxes measured by income of the insurer.

　　2. *The provisions of subsection 1 do not apply to the tax imposed pursuant to the provisions of sections 3 to 45, inclusive, of this act.*

　　Sec. 74. NRS 683A.451 is hereby amended to read as follows:

　　683A.451 The Commissioner may refuse to issue a license or certificate pursuant to this chapter or may place any person to whom a license or certificate is issued pursuant to this chapter on probation, suspend the person for not more than 12 months, or revoke or refuse to renew his or her license or certificate, or may impose an administrative fine or take any combination of the foregoing actions, for one or more of the following causes:

　　1. Providing incorrect, misleading, incomplete or partially untrue information in his or her application for a license.

　　2. Violating a law regulating insurance, or violating a regulation, order or subpoena of the Commissioner or an equivalent officer of another state.

　　3. Obtaining or attempting to obtain a license through misrepresentation or fraud.

　　4. Misappropriating, converting or improperly withholding money or property received in the course of the business of insurance.

　　5. Intentionally misrepresenting the terms of an actual or proposed contract of or application for insurance.

　　6. Conviction of a felony.

　　7. Admitting or being found to have committed an unfair trade practice or fraud.

　　8. Using fraudulent, coercive or dishonest practices, or demonstrated incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this State or elsewhere.

　　9. Denial, suspension or revocation of a license as a producer of insurance, or its equivalent, in any other state, territory or province.

　　10. Forging another's name to an application for insurance or any other document relating to the transaction of insurance.

　　11. Improperly using notes or other reference material to complete an examination for a license related to insurance.

　　12. Knowingly accepting business related to insurance from an unlicensed person.

　　13. Failing to comply with an administrative or judicial order imposing an obligation of child support.

　　14. Failing to pay a tax as required pursuant to the provisions of chapter 363A of NRS [.] *or sections 3 to 45, inclusive, of this act.*

　　Sec. 75. NRS 686C.360 is hereby amended to read as follows:

　　686C.360 The Association is exempt from payment of all fees and all taxes levied by this state or any of its political subdivisions, except taxes on property [.] *and the tax imposed pursuant to sections 3 to 45, inclusive, of this act.*

　　Sec. 76. NRS 687A.130 is hereby amended to read as follows:

　　687A.130 The Association is exempt from payment of all fees and all taxes levied by this State or any of its subdivisions, except taxes:

　　1. Levied on real or personal property; or

　　2. Imposed pursuant to the provisions of chapter 363A or 363B of NRS [.] *or sections 3 to 45, inclusive, of this act.*

　　Sec. 77. NRS 688C.210 is hereby amended to read as follows:

　　688C.210　1. After notice, and after a hearing if requested, the Commissioner may suspend, revoke, refuse to issue or refuse to renew a license under this chapter if the Commissioner finds that:

　　(a) There was material misrepresentation in the application for the license;

　　(b) The licensee or an officer, partner, member or significant managerial employee has been convicted of fraudulent or dishonest practices, is subject to a final administrative action for disqualification, or is otherwise shown to be untrustworthy or incompetent;

　　(c) A provider of viatical settlements has engaged in a pattern of unreasonable payments to viators;

　　(d) The applicant or licensee has been found guilty or guilty but mentally ill of, or pleaded guilty, guilty but mentally ill or nolo contendere to, a felony or a misdemeanor involving fraud, forgery, embezzlement, obtaining money under false pretenses, larceny, extortion, conspiracy to defraud or any crime involving moral turpitude, whether or not a judgment of conviction has been entered by the court;

　　(e) A provider of viatical settlements has entered into a viatical settlement in a form not approved pursuant to NRS 688C.220;

　　(f) A provider of viatical settlements has failed to honor obligations of a viatical settlement or an agreement to purchase a viatical settlement;

　　(g) The licensee no longer meets a requirement for initial licensure;

　　(h) A provider of viatical settlements has assigned, transferred or pledged a viaticated policy to a person other than another provider licensed under this chapter, a purchaser of the viatical settlement or a special organization;

　　(i) The applicant or licensee has provided materially untrue information to an insurer that issued a policy that is the subject of a viatical settlement;

(j) The applicant or licensee has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS [;] *or sections 3 to 45, inclusive, of this act;*

(k) The applicant or licensee has violated a provision of this chapter or other applicable provisions; or

(l) The applicant or licensee has acted in bad faith with regard to a viator.

2. A suspension imposed for grounds set forth in paragraph (k) or (l) of subsection 1 must not exceed a period of 12 months.

3. If the Commissioner takes action as described in subsection 1, the applicant or licensee may apply in writing for a hearing before the Commissioner to determine the reasonableness of the action taken by the Commissioner, pursuant to the provisions of NRS 679B.310 to 679B.370, inclusive.

Sec. 78. NRS 694C.450 is hereby amended to read as follows:

694C.450  1. Except as otherwise provided in this section, a captive insurer shall pay to the Division, not later than March 1 of each year, a tax at the rate of:

(a) Two-fifths of 1 percent on the first $20,000,000 of its net direct premiums;

(b) One-fifth of 1 percent on the next $20,000,000 of its net direct premiums; and

(c) Seventy-five thousandths of 1 percent on each additional dollar of its net direct premiums.

2. Except as otherwise provided in this section, a captive insurer shall pay to the Division, not later than March 1 of each year, a tax at a rate of:

(a) Two hundred twenty-five thousandths of 1 percent on the first $20,000,000 of revenue from assumed reinsurance premiums;

(b) One hundred fifty thousandths of 1 percent on the next $20,000,000 of revenue from assumed reinsurance premiums; and

(c) Twenty-five thousandths of 1 percent on each additional dollar of revenue from assumed reinsurance premiums.

➥The tax on reinsurance premiums pursuant to this subsection must not be levied on premiums for risks or portions of risks which are subject to taxation on a direct basis pursuant to subsection 1. A captive insurer is not required to pay any reinsurance premium tax pursuant to this subsection on revenue related to the receipt of assets by the captive insurer in exchange for the assumption of loss reserves and other liabilities of another insurer that is under common ownership and control with the captive insurer, if the transaction is part of a plan to discontinue the operation of the other insurer and the intent of the parties to the transaction is to renew or maintain such business with the captive insurer.

3. If the sum of the taxes to be paid by a captive insurer calculated pursuant to subsections 1 and 2 is less than $5,000 in any given year, the captive insurer shall pay a tax of $5,000 for that year. The maximum aggregate tax for any year must not exceed $175,000. The maximum aggregate tax to be paid by a sponsored captive insurer applies only to each protected cell and does not apply to the sponsored captive insurer as a whole.

4. Two or more captive insurers under common ownership and control must be taxed as if they were a single captive insurer.

5. Notwithstanding any specific statute to the contrary and except as otherwise provided in this subsection, the tax provided for by this section constitutes all the taxes collectible pursuant to the laws of this State from a captive insurer, and no occupation tax or other taxes may be levied or collected from a captive insurer by this State or by any county, city or municipality within this State, except for taxes imposed pursuant to chapter 363A or 363B of NRS *or sections 3 to 45, inclusive, of this act* and ad valorem taxes on real or personal property located in this State used in the production of income by the captive insurer.

6. Twenty-five percent of the revenues collected from the tax imposed pursuant to this section must be deposited with the State Treasurer for credit to the Account for the Regulation and Supervision of Captive Insurers created pursuant to NRS 694C.460. The remaining 75 percent of the revenues collected must be deposited with the State Treasurer for credit to the State General Fund.

7. A captive insurer that is issued a license pursuant to this chapter after July 1, 2003, is entitled to receive a nonrefundable credit of $5,000 applied against the aggregate taxes owed by the captive insurer for the first year in which the captive insurer incurs any liability for the payment of taxes pursuant to this section. A captive insurer is entitled to a nonrefundable credit pursuant to this section not more than once after the captive insurer is initially licensed pursuant to this chapter.

8. As used in this section, unless the context otherwise requires:

(a) "Common ownership and control" means:

(1) In the case of a stock insurer, the direct or indirect ownership of 80 percent or more of the outstanding voting stock of two or more corporations by the same member or members.

(2) In the case of a mutual insurer, the direct or indirect ownership of 80 percent or more of the surplus and the voting power of two or more corporations by the same member or members.

(b) "Net direct premiums" means the direct premiums collected or contracted for on policies or contracts of insurance written by a captive insurer during the preceding calendar year, less the amounts paid to policyholders as return premiums, including dividends on unabsorbed premiums or premium deposits returned or credited to policyholders.

Sec. 79. NRS 695A.550 is hereby amended to read as follows:

695A.550  Every society organized or licensed under this chapter is hereby declared to be a charitable and benevolent institution, and is exempt from every state, county, district, municipal and school

tax other than *the tax imposed pursuant to sections 3 to 45, inclusive, of this act and* taxes on real property and office equipment.

Sec. 80.  1.  Subject to the provisions of section 82 of this act, there is hereby appropriated from the State General Fund to the Department of Taxation for the initial costs of administering the provisions of sections 3 to 45, inclusive, of this act:

For fiscal year 2013-2014 ............................................................................$2,900,000
For fiscal year 2014-2015 ............................................................................$2,700,000

2.  The sums appropriated by subsection 1 are available for either fiscal year. Any remaining balance of the appropriation made by subsection 1 must not be committed for expenditure after June 30, 2015, and reverts to the State General Fund as soon as all payments of money committed have been made.

Sec. 81.  1.  Subject to the provisions of section 82 of this act, there is hereby appropriated from the State General Fund to the Department of Taxation for the initial costs of administering the provisions of sections 3 to 45, inclusive, of this act:

For fiscal year 2014-2015 ............................................................................$1,400,000
For fiscal year 2015-2016 ............................................................................$4,200,000

2.  The sums appropriated by subsection 1 are available for either fiscal year. Any remaining balance of the appropriation made by subsection 1 must not be committed for expenditure after June 30, 2016, and reverts to the State General Fund as soon as all payments of money committed have been made.

Sec. 82.  The amendatory provisions of sections 50 and 51 of this act, as applicable, are intended to raise the revenue necessary to support the appropriation made by section 80 or 81 of this act, whichever becomes effective, as required by Section 6 of Article 19 of the Nevada Constitution. If the revenue so raised is not sufficient to support the full amount of the appropriation in either fiscal year, the appropriation for that year is reduced to the extent of the deficiency.

Sec. 83.  1.  If this act is enacted by the 77th Session of the Legislature and approved by the Governor as provided in subsection 3 of Section 2 of Article 19 of the Nevada Constitution:

(a) This section, sections 1 to 21, inclusive, sections 23 to 50, inclusive, sections 53 to 80, inclusive, and sections 82 and 84 of this act become effective on July 1, 2013.

(b) Section 22 of this act becomes effective on January 1, 2014.

(c) Section 50 of this act expires by limitation on June 30, 2015.

(d) Sections 51, 52 and 81 of this act shall not become effective.

2.  If this act is not enacted and approved as provided in subsection 1, but is approved by the voters after the act has been referred or submitted to the voters pursuant to subsection 3 of Section 18 of Article 4 or subsection 3 of Section 2 of Article 19 of the Nevada Constitution:

(a) This section, sections 1 to 50, inclusive, sections 53 to 79, inclusive, and sections 81, 82 and 84 of this act become effective on January 1, 2015.

(b) Section 51 of this act becomes effective on July 1, 2015.

(c) Section 52 of this act becomes effective on July 1, 2016.

(d) Section 80 of this act shall not become effective.

3.  For the purposes of subsection 1, this act shall be deemed to have been approved by the Governor if, in accordance with Section 35 of Article 4 of the Nevada Constitution:

(a) The Governor signs the act;

(b) The act is passed by both Houses of the Legislature during its 77th Session notwithstanding the objections of the Governor; or

(c) The Governor fails to return or file the act within the time provided by Section 35 of Article 4 of the Nevada Constitution.

Sec. 84.  If any provision of this act or its application to any person or circumstance is held to invalid or ineffective, that invalidity or ineffectiveness must be given the narrowest possible construction and shall not affect any other provision or application of this act.

[The remainder of this page is blank.]